LUZ MARÍA MARTÍNEZ, demandante y recurrida, *v.* WILFREDO COLÓN FRANCO y NIVIA CONCEPCIÓN, demandados y recurrentes, y JUANA FRANCO, interventora y recurrente.

*Número:* RE-86-6 *Resuelto:* 19 de diciembre de 1989

16

18

*Marisa Brugueras*, abogada de los recurrentes; *Carlos L. González Alonso*, abogado de la recurrida; *Rafael Rivera Rosa*, abogado de la interventora.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del Tribunal.

La divergencia entre lo aparente y lo real en el campo contractual provoca la presente controversia. Veamos los hechos.

El 25 de marzo de 1980 el Sr. Wilfredo Colón Franco y su esposa, la Sra. Nívea Concepción, comparecieron, en calidad de compradores de un inmueble sito en el Municipio de Caguas, ante el notario Libertario Pérez Rodríguez. En dicha fecha otorgaron, conjuntamente con la Sra. Luz María Martínez, quien compareció como vendedora, una escritura de compraventa y constitución de hipoteca sobre el inmueble antes mencionado que aparecía inscrito en el Registro de la Propiedad de la manera siguiente:

> Parcela de terreno radicada en el barrio Bairoa del término municipal de Caguas, Puerto Rico, compuesta de aproximadamente veinticinco centésimas de cuerda, equivalentes a MIL CATORCE METROS Y CON NOVENTA Y TRES CENTÍMETROS CUADRADOS (1,014,93 mc) en lindes, por el Norte, con terrenos del Municipio de Caguas y el camino vecinal del Barrio Bairoa, por el Sur, con la parcela que se segregó anteriormente; por el Este, con la Carretera Estatal número Uno; y por el Oeste, con terrenos de Don Leoncio Velázquez.
>
> Sobre esta parcela enclava un rancho de madera y zinc y dos casas de madera pequeñas y esta parcela está cercada con una verja de "cyclone fence", según las constancias del Registro. Sin embargo las tres estructuras mencionadas fueron destruidas hace algún tiempo y en la actualidad la parcela se encuentra libre de edificaciones. Apéndice del alegato de la recurrida, pág. 34.

Se hizo constar en dicha escritura que el precio de venta sería $126,000, precio aplazado a ser garantizado con la expedición de siete (7) pagarés al portador de $18,000 cada uno, garantizados a su vez con hipoteca sobre la propiedad. Hasta ahí el negocio jurídico aparente.

En realidad hacía algún tiempo que la señora Martínez estaba en conversaciones con la Sra. Juana Franco (Doña Jua-

nita), madre del señor Colón Franco, para la compra de la antes mencionada propiedad. La cabida real del inmueble era de 3,669.3896 metros cuadrados, alrededor de dos terceras (⅔) partes más de lo que constaba inscrito en el Registro de la Propiedad. En marzo de 1980 la demandante recurrida y Doña Juanita acordaron realizar la transacción por la suma de $226,000. Según el acuerdo, comparecerían como compradores los esposos Wilfredo Colón Franco y Nívea Concepción, y la escritura de compraventa no reflejaría la cantidad de $100,000 que Doña Juanita le entregaría a la compradodra al firmarse la escritura.[1] En resumen, se llevó a cabo el negocio jurídico, en el cual $100,000 pasaban a manos de la vendedora sin que constara en la escritura de compraventa en la que la compradora no comparecería como otorgante.

Habida cuenta que la mayor parte del predio no constaba inscrito, se estipularon las cláusulas novena y décima de la escritura de compraventa, que señalaban:

NOVENO: Según manifiesta la VENDEDORA esta finca tiene una cabida de TRES MIL SEISCIENTOS SESENTA Y NUEVE PUNTO TRES MIL OCHOCIENTOS NOVENTA Y SEIS METROS CUADRADOS (3,669.3896). *Se compromete la VENDEDORA a realizar los trámites necesarios para hacer inscribible el exceso de cabida que se menciona anteriormente.* El COMPRADOR tendrá el derecho de realizar una mensura de la finca y el precio de Compraventa aquí pactado será ajustado a razón de SESENTA Y UN DÓLARES CON CINCUENTA CENTAVOS ($61.50) por metro cuadrado.

DÉCIMO: Igual ajuste al mencionado en el párrafo anterior se realiza si la cabida de la finca objeto de esta escritura según expresada en el párrafo Noveno anterior, quedará redu-

---

[1] La Sra. Juana Franco hizo entrega a la señora Martínez de $82,000 en efectivo y suscribió un pagaré personal sin garantía hipotecaria por la cantidad de $18,000.

cida por razón del resultado de cualquier reclamación de cualquiera de los colindantes de la finca por·controversias en la localización de dichas colindancias. (Énfasis suplido.) Apéndice del alegato de la recurrida, pág. 38.

La escritura se presentó para su inscripción en el Registro de la Propiedad el 16 de septiembre de 1980. Mientras tanto, un colindante de la propiedad había invadido parte del terreno levantando allí una edificación de madera sobre piso de cemento.[2] La vendedora contrató los servicios del Lcdo. Libertario Pérez para obtener el desalojo de la propiedad. El 24 de octubre de 1980, a cinco (5) meses de haberse suscrito la escritura de compraventa y constitución de hipoteca, se presentó el Caso Civil Núm. CS-80-1041, sobre *injunction* posesorio, ante el Tribunal Superior, Sala de Caguas. Este procedimiento se extendió durante dos (2) años y cuatro (4) meses, hasta que recayó sentencia mediante la cual se ordenaba al poseedor ilegal a desalojar la propiedad. La solicitud de revisión fue denegada por este Tribunal (Caso RE-82-152).

Mientras pendía ese pleito, la compradora Doña Juanita Franco retuvo el pago de los intereses correspondientes a dicho período de tiempo. Terminado el pleito, la vendedora nunca realizó los trámites pactados para hacer inscribible el exceso de cabida, a pesar de los requerimientos que a esos efectos le hiciera la compradora. Durante el trámite procesal se adujeron varias razones para justificar esta acción de la vendedora, pero en el juicio ésta atestó:

---

[2] Las partes en sus escritos señalan dos (2) momentos diferentes en que alegan que se enteraron de la invasión. La interventora recurrente alega que se enteró cuando "intenta tomar posesión del inmueble adquirido". Solicitud de revisión, pág. 3. Y la recurrida alega que advino en conocimiento de la invasión antes de la transacción. Alegato de la recurrida, pág. 3. El tribunal de instancia no hizo determinación de hecho al respecto. Sin embargo, la propia demandante recurrida atestó que: "R. Porque ... *cuando se hizo el negocio*, tanto la otra parte como yo nos enteramos que había una persona que invadió el terreno y entró allí." (Énfasis suplido.) Transcripción de la vista, pág. 18.

P. Testigo, y en adición a recibir esos cien mil dólares en efectivo, que usted declara que no se hizo constar en la escritura, ¿había que hacer . . . usted tenía que hacer algo m[á]s? ¿O ya había terminado su parte de esa compraventa, de esa escritura?

R. Entre las partes hubo unas . . . unos compromisos que se le hicieron en la escritura. Por ejemplo, uno de ellos era que la cabida del solar era m[á]s de la que decía la escritura. Y había que hacer una rectificación.

P. O sea, que en adición al precio que figuraba en la escritura, ¿usted también, tenía un compromiso de inscribir una cabida adicional?

R. Correcto.

P. ¿Usted inscribió esa cabida adicional?

R. No. No la inscribí.

P. ¿Y por qué usted no hizo eso y cumplió con lo que pactó de inscribirlo?

R. Porque . . . cuando se hizo el negocio, tanto la otra parte como yo nos enteramos que había una persona que invadió el terreno y entró allí. Yo, para hacer una rectificación, pues tiene que estar claro. Entonces, cuando esa persona all[í], la persona quitó la cerca y se entró a la propiedad. Entonces, tuvimos que ir por las vías legales para sacar esa persona de all[í]. Eso fue un caso que se ventiló en esta misma Corte y duró dos años preciso[s].

P. ¿Y usted fue al juicio?

R. Sí, señor. Porque yo tenía interés de que en el caso se limpiara el problema que había para continuar con el otro. Y yo lo hice, sí señor.

P. Y para inscribir la cabida, ¿después que se terminó el pleito ese?

R. Bueno, después que terminó el pleito, que cogió dos años, ellos no cumplieron con el pago. Entonces, yo no podía hacer la rectificación porque usted sabe que para eso se necesita dinero. Y ellos no me pagaron nunca un centavo de intereses. Y por esa razón . . . o sea, que ellos no cumplieron nunca conmigo tampoco. O sea, por esa razón . . . empecé el procedimiento pero lo tuve que dejar. Entonces, me fui a Santo Domingo. Transcripción de la vista, págs. 17–19.

El 3 de junio de 1983 la vendedora presentó una demanda sobre ejecución de hipoteca contra Wilfredo Colón Franco y esposa. No incluyó en la misma a Doña Juanita Franco, a pesar de que conocía que era la parte realmente interesada, ni a la Sociedad Legal de Gananciales compuesta por los originalmente demandados.[3] En la demanda se reclamó la suma de $126,000, intereses sobre dicha suma a razón de diez por ciento (10%) desde el 25 de marzo hasta su completo pago y el diez por ciento (10%) adicional del principal para costas, gastos y honorarios de abogado.

El 24 de agosto de 1983 se contestó la demanda y se plantearon como defensas afirmativas la nulidad del contrato por razón de simulación; la falta de partes indispensables, a saber, la Sociedad Legal de Gananciales compuesta por los demandados y Doña Juanita Franco; el incumplimiento por parte de la demandante con las condiciones del contrato, y el impedimento por actos propios por venir al tribunal con "las manos sucias" (*unclean hands*).

El 14 de marzo de 1985 la interventora recurrente presentó demanda, dentro del mismo pleito de ejecución de hipoteca, en la que solicitó la devolución de los $100,000 pagados a la parte demandante, más daños y perjuicios por incumplimiento de contrato. Alegó que la falta de cumplimiento de las prestaciones a las que se comprometió la vendedora provocó que no pudiese obtener un préstamo garantizado por hipoteca para saldar la deuda.

Durante el proceso surgió que los pagarés cuya ejecución se pretendía, habían sido dados en prenda mediante documento público al Sr. Alberto Rodríguez. Dicha persona tampoco fue parte en el pleito, sólo los entregó a la demandante

---

[3] Posteriormente se enmendó la demanda para incluir a la Sociedad Legal de Gananciales. También solicitó intervención la recurrente, Sra. Juana Franco, mediante Moción de 23 de agosto de 1983.

para presentarlos en la vista y a quien ésta debía devolverlos posteriormente.

Finalizado el desfile de prueba en corte abierta, el tribunal de instancia declaró con lugar la demanda y ordenó a la demandante a someter un proyecto de sentencia. La sentencia declaró con lugar la demanda, sin lugar la demanda de la interventora y ordenó la venta en pública subasta de la propiedad para ejecutar la hipoteca.

El tribunal concluyó que los demandados esposos Colón-Concepción suscribieron la escritura de compraventa en representación y para beneficio de la interventora Doña Juanita Franco; que la admisión de la interventora de que ella era la dueña de la propiedad en controversia tuvo el efecto de una contradeclaración mediante la cual se descubrió la verdadera causa del contrato simulado; que la simulación contractual entre las partes no hizo nulo el negocio, subsistiendo sus efectos legales entre las partes, y que ni los codemandados ni la interventora cumplieron con sus obligaciones contractuales referentes a los siete (7) pagarés.

A instancia de los demandados y de la interventora expedimos auto para revisar dicha sentencia.

## I

Nos encontramos nuevamente ante un problema de simulación relativa contractual, esto es, la existencia de un negocio jurídico aparente tras del cual se esconde el negocio real y verdaderamente querido por las partes. *Hernández Usera v. Srio. de Hacienda*, 86 D.P.R. 13, 18 (1962); J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1971, Vol. I, T. II, págs. 486–487; F. De Castro y Bravo, *El Negocio Jurídico*, Madrid, Ed. Inst. Nac. Est. Jur., 1967, Sec. 403, pág. 334. Luis Díez-Picazo la define de la forma siguiente:

La simulación *relativa* es un disfraz: en ella se realiza aparentemente un negocio jurídico, queriendo y llevando a cabo

en realidad otro distinto. Los contratantes concluyen un negocio verdadero, que ocultan bajo una forma diversa, de tal modo que su verdadera naturaleza permanece secreta. (Énfasis en el original.) L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 4ta ed., Madrid, Ed. Tecnos, 1984, Vol. II, pág. 79.

 Esta teoría de simulación contractual ha sido enmarcada dentro del concepto de causa de los contratos. Así, en la simulación relativa contractual existe una causa falsa en la medida en que la causa figurada no coincide con la real. Díez-Picazo, *op. cit.*, pág. 80. De ahí que el negocio fingido o disimulado, para que sea válido, precisa de la existencia de una causa válida. *Hernández Usera v. Srio. de Hacienda*, supra; De Castro y Bravo, *op. cit.*, pág. 335.

 Expresa el Art. 1228 del Código Civil, 31 L.P.R.A. sec. 3433, que "[l]a expresión de una causa falsa en los contratos dará lugar a la nulidad, si no se probase que estaban fundados en otra verdadera y lícita". En *Reyes v. Jusino*, 116 D.P.R. 275, 284 (1985), señalamos, en torno al alcance de un contrato simulado, que:

> Nuestro ordenamiento jurídico, siguiendo la tradición española, ha optado por la vertiente de tolerar limitadamente los contratos simulados que disimulan una causa verdadera y lícita. Probada la simulación, el contrato simulado queda eliminado, para dar vigencia y efecto al verdadero y disimulado. Puig Brutau, *op. cit.*, págs. 490–491. Conviene precisar a tales efectos el alcance de la simulación cuando se expresa una causa falsa en los contratos. Primero, la simulación por sí misma no hace ilícito o nulo el negocio. Segundo, no obstante, se cierne sobre el negocio una mácula de sospecha. Tercero, una vez descubierta la simulación pierde vigencia la presunción de que la misma es lícita, y ya no recae sobre el deudor la carga de probar su existencia. Cuarto, se ha creado una presunción de simulación absoluta contra el negocio disimulado que compete al gestor rebatir mediante la existencia de una causa verdadera y lícita. De Castro y Bravo, *op. cit.*, pág. 352.

█ Los tratadistas han reconocido la existencia de varias formas de simulación: simulación en la naturaleza del contrato, en el contenido del contrato o en los sujetos del contrato. La simulación en la naturaleza del contrato se da cuando se simula un contrato pero realmente se está celebrando otro distinto, *e.g.*, se simula una compraventa pero realmente se está llevando a cabo una donación. En la simulación en el contenido del contrato se simula la fecha, el precio, el objeto o cualquier otro elemento del contrato. Por último, en la simulación en los sujetos del contrato se interpone una tercera persona entre el vendedor y el comprador. Es esta persona quien comparece como parte en el contrato, permaneciendo la verdadera parte oculta. F. Ferrara, *La simulación de los negocios jurídicos*, 3ra ed., Madrid, Ed. Rev. Der. Privado, 1953, págs. 238–251; De Castro y Bravo, *op. cit.*, págs. 340–345.

En el caso de autos quedó al descubierto que el contrato de compraventa realizado entre la demandante recurrida Luz M. Martínez y los demandados recurrentes esposos Colón-Concepción contenía varias formas de simulación. Si bien no hubo simulación en la naturaleza del contrato, pues realmente se llevó a cabo una compraventa, sí hubo simulación en el contenido y en los sujetos del contrato. Se hizo constar como precio de venta $126,000, cuando el verdadero precio que debía pagarse era $226,000, y comparecieron como compradores en la escritura de compraventa los esposos Colón-Concepción, siendo la verdadera compradora Doña Juanita Franco. Veamos cuál es el efecto de dichas simulaciones.

█ En cuanto a la simulación en el precio de la venta, dicha simulación no hace ilícito o nulo el contrato celebrado. En *Reyes v. Jusino*, supra, pág. 287, expresamos, citando a Ferrara, que:

"En éste, como en otros casos, en que se disfraza la naturaleza del contrato para defraudar a la Administración en sus

derechos fiscales, existe ciertamente una simulación *contra legem*; pero no por ello debe creerse que el contrato haya de ser nulo. Tuvimos ya ocasión de decir que, al quitar su disfraz al negocio, debe aplicarse a éste la sanción cualquiera que sea, que hubiera debido aplicársele si se hubiera celebrado manifiestamente. Es sabido que no tod[a]s las leyes prohibitivas tienen el mismo alcance, pues mientras unas se inspiran en un interés muy general, otras protegen un interés limitado, y otras finalmente, obedecen a meras finalidades de disciplina, financieras o de policía; y así, según la importancia de la prohibición, las sanciones serán unas u otras. La transgresión de las leyes de orden público produce la nulidad total del acto; la de las leyes de la segunda clase, una mera anulabilidad, y la de las últimas, una pena para el autor. En el tercer grupo figuran precisamente las leyes financieras, que establecen el pago de un impuesto a favor del Estado, según la naturaleza del acto, y al eludir sus normas se comete una *contravención* castigada con una simple *multa*." (Énfasis en el original.)

Resolvimos en dicho caso que las infracciones al erario, como la cometida en este caso al simular el precio de venta, no debían quedar impunes. Señalamos que para evitar las mismas, el remedio adecuado era remitir el asunto al Secretario de Hacienda para la acción que estimase pertinente. Reafirmamos dicha norma. Aunque la simulación del precio de venta no acarree la nulidad del contrato, en los casos en que se dé esta situación deben remitirse los autos al Secretario de Hacienda. *Reyes v. Jusino*, supra, y casos allí citados.

En cuanto a la simulación en los sujetos del contrato, la misma resulta ser un poco más compleja que las demás formas de simulación. Federico De Castro y Bravo señala dos (2) formas distintas en que se puede dar esta simulación: mediante la interposición de persona ficticia o mediante la puesta a nombre de otro. De Castro y Bravo, *op. cit.*, págs. 342–344. Bajo la primera figura la persona interpuesta aparece para crear una mera apariencia y ocultar al

verdadero adquirente o vendedor. Bajo la segunda figura no existe intermediario, sino que se hace figurar como parte a la persona a la que se quiere beneficiar con el negocio, permaneciendo oculta la persona que verdaderamente realiza el mismo: ·

En esta última figura se suprime el intermediario, y se oculta el negocio de transmisión, haciendo que aparezca el beneficiario como titular originario o inmediato. Por ejemplo, D abona el precio de la finca que se compra a T y hace que figure como comprador su hijo H. Siendo lo mismo que D actúe como apoderado de H o que el mismo H pague el precio con el dinero que D le haya entregado. El Reglamento hipotecario tiene especialmente en cuenta la posibilidad de que se inscriba inexactamente (bajo el régimen de gananciales) un derecho a nombre de uno de los cónyuges (art. 95).

El carácter sincopado de la figura, no la diferencia suficientemente de la interposición de persona, para salvarle de las sanciones que se imponen a este tipo de simulación. Se trata de un procedimiento de ocultación, cuyo descubrimiento permitirá valorar la validez y eficacia de lo disimulado. Desvelado lo que se hizo, en el ejemplo puesto, podrá resultar su validez (se trata de partición de bienes entre los herederos por acto inter vivos, artículo 1.056) su nulidad, si incurre en alguna prohibición (arts. 628, 755, 1.459) o tiene causa ilícita (p. ej., defraudar a los legitimarios, art. 1.275) y también su impugnabilidad (p. ej., para defraudar a los acreedores, artículo 1.291).

Pero puede no quedar claro cuál sea el significado del negocio ocultado: ¿ha donado D el dinero que se pagó como precio o ha donado la finca? Lo que importa mucho, para saber lo que ha de volver al patrimonio de D al declararse la simulación; lo que interesará también, en su caso, a los acreedores y legitimarios de D. Para contestar la pregunta no habrá que acudir a la voluntad presunta de las partes. No sólo el dinero es de D sino también la ganancia o pérdida que suponga la compra; ya que no se dio simplemente el dinero, sino que se da *para tal* compra. Con ello, se facilita la acción de los interesados, al declararse la simulación y si se trata, como en el ejemplo utilizado, de un bien inmueble, la donación misma sería nula por falta de forma (art. 633). (Énfasis en el original.) De Castro y Bravo, *op. cit.*, pág. 344.

Es ésta precisamente la situación del caso de autos. El propósito de la interventora recurrente fue adquirir el inmueble en controversia para beneficio de su hijo.(4) Por tal razón, hizo comparecer a su hijo y nuera como compradores en la escritura de compraventa aun cuando fue ella quien acordó los términos de la compraventa y quien abonó la suma pagada por adelantado.

El propósito y efecto de la actuación de Doña Juanita fue donar el inmueble a su hijo. No obstante, siendo el propósito de esta simulación donar un bien inmueble, para determinar la validez de la misma hemos de acudir a lo dispuesto en el Art. 575 del Código Civil, 31 L.P.R.A. sec. 2010:

> Para que sea válida la donación de cosa inmueble ha de hacerse en escritura pública, expresándose en ella individualmente los bienes donados y el valor de las cargas que deba satisfacer el donatario.
>
> La aceptación podrá hacerse en la misma escritura de donación o en otra separada; pero no surtirá efecto si no se hiciese en vida del donante.
>
> Hecha en escritura separada, deberá notificarse la aceptación en forma auténtica al donante, y se anotará esta diligencia en ambas escrituras.

En *Hernández Usera v. Srio. de Hacienda,* supra, resolvimos que todo lo que se requiere para que una donación disimulada cumpla con las formalidades del Art. 575 del

---

(4) De la Transcripción de la vista, pág. 51, surge dicha intención:

"P. Cuando a usted le . . . perdón, retiro la pregunta. ¿Usted le puede explicar al Tribunal por qué dicha transacción aparece a nombre de Wilfredo Colón y esposa y no aparece usted en dicha compra-venta, que fue la persona que . . . entregó el dinero y . . . ?

"R. ¿Por qué? No le oigo.

"P. ¿Que cu[á]l es la razón que en la escritura de compra-venta no aparece el nombre suyo y sí el nombre de su hijo, a favor de su hijo, el señor Wilfredo Colón Franco y su esposa, Nivia Concepción?

"R. Porque como ya ese terreno había sido de nosotros, había una cuestión de sentimiento. Y yo quise comprar el terreno para regalárselo a Wilfredo."

Código Civil, *supra*, es que el contrato que la encubre se otorgue mediante escritura pública; que se describan individualmente los bienes donados; que se expresen las cargas que asume el donatario, si alguna, y que se haga constar su aceptación en la misma escritura o en otra separada, pudiendo deducirse la misma de la firma del documento simulado. *La Costa Sampedro v. La Costa Bolívar*, 112 D.P.R. 9, 26 (1982).

En el caso de autos el contrato de compraventa se elevó a escritura pública, en la cual se describió individualmente el bien donado, y de la firma del señor Colón Franco en dicha escritura se deduce su aceptación. A tenor con lo resuelto en *Hernández Usera v. Srio. de Hacienda*, supra, es menester concluir que la donación realizada mediante el contrato simulado cumple con los requisitos de forma del Art. 575 del Código Civil, *supra*, por lo que la misma es totalmente válida. Esto, a su vez, nos lleva a concluir que aun cuando se expresó una causa falsa en el contrato simulado, existía una causa verdadera y lícita en el contrato disimulado. Descubierta la simulación, queda eliminado el contrato simulado y cobra vigencia y efecto el disimulado. En el caso de autos el contrato disimulado consistió en la venta por parte de la demandante recurrida a la interventora recurrente del inmueble en controversia, incluso el exceso de cabida no inscrito, por la suma de $226,000 y la simultánea donación del inmueble a favor del demandado recurrente, señor Colón Franco. Es éste el contrato que prevalece y que rige la relación entre las partes. Veamos si se incumplieron los términos del mismo.

El Art. 1334 del Código Civil, 31 L.P.R.A. sec. 3741, dispone que "[p]or el contrato de compra y venta uno de los contratantes se obliga a entregar una cosa determinada y el otro a pagar por ella un precio cierto, en dinero o

signo que lo represente". En cuanto a las obligaciones del vendedor y del comprador bajo un contrato de compraventa, disponen los Arts. 1350, 1363, 1389 y 1391 (31 L.P.R.A. secs. 3801, 3831, 3871 y 3873, respectivamente) que:

Art. 1350– El vendedor está obligado a la entrega y saneamiento de la cosa objeto de la venta.

Art. 1363– En virtud del saneamiento a que se refiere la sec. 3801 de este título, el vendedor responderá al comprador:

(1) De la posesión legal y pacífica de la cosa vendida.

(2) De los vicios o defectos ocultos que tuviere.

Art. 1389– El comprador está obligado a pagar el precio de la cosa vendida en el tiempo y lugar fijados por el contrato.

Si no se hubieren fijado, deberá hacerse el pago en el tiempo y lugar en que se haga la entrega de la cosa vendida.

Art. 1391– Si el comprador fuere perturbado en la posesión o dominio de la cosa adquirida, o tuviere fundado temor de serlo por una acción reivindicatoria o hipotecaria, podrá suspender el pago del precio hasta que el vendedor haya hecho cesar la perturbación o el peligro, a no ser que afiance la devolución del precio en su caso, o se haya estipulado que no obstante cualquiera contingencia de aquella clase, el comprador estará obligado a verificar el pago.

La demandante se obligó a entregar el inmueble y a inscribir el exceso de cabida. La interventora, a su vez, se obligó a pagar el precio acordado de $226,000, de los cuales $100,000 se pagarían por adelantado y sin que constaran en la escritura pública y los restantes $126,000 se pagarían en siete (7) pagarés de $18,000 cada uno con vencimiento en tres (3) años e intereses al diez por ciento (10%) anual pagaderos cada seis (6) meses. Se llevó a cabo la compraventa y la interventora pagó los $100,000 al momento de firmarse la escritura de compraventa. No obstante, al intentar tomar posesión del inmueble se percataron de que el mismo había sido invadido por uno de los colindantes, quien había levantado allí una edificación. Dado lo dispuesto en los Arts. 1350 y 1363 del Código Civil antes citado, la vendedora venía obli-

gada al saneamiento de la cosa objeto del contrato y a asegurar a la compradora la posesión legal y pacífica de dicho objeto. Con tal propósito y en cumplimiento de ese deber de saneamiento, la vendedora instó acción de interdicto posesorio para obtener el desalojo de la propiedad. Dicha acción duró aproximadamente dos (2) años, tiempo durante el cual la compradora, amparada en lo dispuesto en el Art. 1391 del Código Civil, *supra,* podía suspender el pago del precio. Así lo hizo. No representó dicha suspensión incumplimiento alguno con los términos del contrato.

 Luego de obtenerse el desalojo de la propiedad, la vendedora venía obligada a cumplir los restantes términos del contrato, esto es, inscribir el exceso de cabida, máxime cuando dicho exceso representaba más de dos terceras (⅔) partes del inmueble en cuestión. No obstante, la vendedora se negó a realizar dicha inscripción aduciendo como defensa para su incumplimiento la falta de pago de los intereses por parte de la compradora. Al actuar de dicha forma incumplió los términos del contrato. Como ya mencionáramos, la compradora no venía obligada a hacer pago alguno hasta tanto cesara la perturbación que impedía el disfrute del inmueble adquirido; tampoco tenía que cumplir con su obligación de pagar intereses cada seis (6) meses, según pactado, ya que la vendedora no cumplió debidamente sus prestaciones. Actuó correctamente la compradora al negarse a pagar los intereses. Siendo el contrato de compraventa un contrato bilateral, creador de obligaciones recíprocas, cada parte debía cumplir simultáneamente su prestación. Si bien la vendedora había hecho entrega del inmueble, se negó a cumplir o intentar cumplir la obligación de inscribir el exceso de cabida. No podía entonces reclamarle a la compradora el cumplimiento de su obligación de pagar intereses. Al reclamar el pago de intereses sin haber cumplido cabalmente con su obligación, le era oponible la defensa de *exceptio non rite adimpleti*

*contractus* o excepción de cumplimiento defectuoso, modalidad de la excepción general de contrato no cumplido o *exceptio non adimpleti contractus*. Díez-Picazo, *op. cit.*, págs. 226–227.

 La excepción de contrato no cumplido, norma fundamentada en la simultaneidad y reciprocidad de las obligaciones, establece que ninguna parte puede exigir el cumplimiento de una obligación contraria sin antes cumplir o intentar cumplir su propia obligación.[5] La modalidad de *exceptio non rite adimpleti contractus*, por su parte, es oponible al demandante que ejecuta su prestación aunque en forma parcial o defectuosa. Bajo ésta se autoriza al demandado a detraer de su prestación el importe de lo no realizado o a reducirla en atención a lo llevado a cabo defectuosamente. Díez-Picazo, *op. cit.*, pág. 227.

La interventora ejerció correctamente sus derechos al suspender el pago y levantar como defensa el incumplimiento por parte de la demandante de su obligación de inscribir el exceso de cabida. Erró el tribunal de instancia al determinar que dicha actuación constituyó un incumplimiento de los términos del contrato.

Atendido lo anterior, pasamos a determinar si es válida la hipoteca constituida entre las partes y si, a tenor con los términos del contrato de compraventa, la misma era ejecutable.

 La Ley Hipotecaria y del Registro de la Propiedad (Ley Hipotecaria) requiere, para que quede válidamente constituida una hipoteca voluntaria, que la misma se haya

---

[5] Esta norma o doctrina se infiere de lo dispuesto en el Art. 1053 del Código Civil, 31 L.P.R.A. sec. 3017, el cual dispone, en su parte pertinente, que "ninguno de los delegados incurre en mora si el otro no cumple o no se allana a cumplir debidamente lo que le incumbe. Desde que uno de los obligados cumple su obligación, empieza la mora para el otro". Véase *Mora Dev. Corp. v. Sandín*, 118 D.P.R. 733 (1987).

acordado en escritura pública y que ésta se haya inscrito en el Registro de la Propiedad. Art. 188 de la Ley Hipotecaria, 30 L.P.R.A. sec. 2607.

A su vez, el Art. 1756 del Código Civil, 31 L.P.R.A. sec. 5001, establece como requisitos esenciales del contrato de hipoteca: (1) que la misma se constituya para asegurar el cumplimiento de una obligación principal; (2) que la cosa hipotecada pertenezca en propiedad al que la empeña o hipoteca, y (3) que las personas que constituyan la hipoteca tengan la libre disposición de sus bienes o, en caso de no tenerlas, se hallen legalmente autorizadas al efecto.

En el caso de autos se cumplieron todos los requisitos para la validez del contrato de hipoteca: la propiedad hipotecada pertenecía al señor Colón Franco por razón de la donación disimulada llevada a cabo al realizarse el contrato de compraventa, donación que según establecimos previamente cumple con los requisitos del Art. 575 del Código Civil, *supra*; el propietario tiene la libre disposición de sus bienes; la hipoteca se acordó en escritura pública en la cual se describe el inmueble hipotecado, se tasa la propiedad en $126,000 para que sirva de tipo a la primera subasta y se describen los pagarés que garantizan dicha hipoteca (allí se incluye la cantidad principal, el término de vencimiento e intereses pactados), y dicha escritura se inscribió en el Registro de la Propiedad el 16 de septiembre de 1980.

Determinada la validez de la hipoteca, veamos si erró el tribunal al ordenar la ejecución de la misma.

La cláusula octava, inciso (c), de la escritura de compraventa otorgada por las partes disponía que si el deudor hipotecario llegaba a ser insolvente o se presentaba un procedimiento de quiebra por él *o en su contra, o éste faltaba al cumplimiento de todas o cualesquiera de sus obligaciones, incluso el pago de intereses bajo el pagaré* garantizado

en la forma y manera en que aparecen fijadas en dicho pagaré, la deuda podría ser declarada vencida y pagadera a opción del portador del pagaré y éste podría proceder inmediatamente a la reclamación de la hipoteca. A su vez, la Ley Hipotecaria autoriza la ejecución de la hipoteca, ya sea mediante el procedimiento ejecutivo sumario o por la vía ordinaria, cuando el crédito hipotecario o sus intereses han vencido, en todo o en parte, o cuando el pago del capital o los intereses deba hacerse en plazos diferentes y vencido alguno de dichos plazos el deudor no haya cumplido su obligación de pago. Arts. 201 y 228 de la Ley Hipotecaria, 30 L.P.R.A. secs. 2701 y 2728, respectivamente.

Si bien en el caso de autos el deudor hipotecario no hizo los pagos correspondientes a los intereses según pactados, esto no constituyó incumplimiento de sus obligaciones bajo los términos del contrato ya que, según señaláramos previamente, la retención del pago de intereses por parte de la interventora estaba justificada en derecho dado el incumplimiento por parte de la vendedora de sus obligaciones bajo el contrato de compraventa. No procedía la ejecución de la hipoteca ni bajo la cláusula de aceleración del contrato ni bajo las disposiciones de la Ley Hipotecaria. Erró el tribunal de instancia al declarar con lugar la demanda de la demandante Luz M. Martínez y ordenar la ejecución de la hipoteca a favor de ésta.

El tribunal de instancia también incidió al ordenar la ejecución de la hipoteca a favor de la demandante cuando quedó probado en juicio que los pagarés hipotecarios al portador habían sido dados en prenda y el acreedor prendario no fue adicionado como parte en el pleito. A esos efectos, señalamos en *Reyes v. Jusino*, supra, págs. 280–281 esc. 2, lo siguiente:

Durante el proceso sobrevino a discusión la capacidad de Reyes para cobrar el pagaré hipotecario al portador de

$30,000. Se suscitó, en vista de que su posesión la tenía, en calidad de prenda, su hermano Wilfredo Reyes, como garantía de pago a un préstamo de $15,000 que le hiciera. Durante la vista Wilfredo Reyes atestó no tener objeción al reclamo de su hermano contra Jusino Díaz. Después éste falleció.

Estimamos correcta la determinación del tribunal de instancia al requerir a Rubén Reyes que acreditara la tenencia del pagaré, lo cual no hizo. La mera comparecencia de su hermano Wilfredo Reyes y su aparente autorización a que procediera al cobro del mismo, cuando éste nunca fue parte en el pleito y retuvo dicho pagaré, es insuficiente para convalidar tal práctica. La protección del deudor contra ejecuciones posteriores por el tenedor del documento exige mayor cautela y menos informalidad. El requisito de tenencia, indispensable para el ejercicio y acción de cobro por la vía de apremio, no puede ser soslayado. Arts. 404, 426 y 427 del Código de Comercio de 1932, 19 L.P.R.A. secs. 91, 134, y 135. Véanse: B. Santiago Romero, *Tratado de Instrumentos Negociables*, 2da ed. rev., Río Piedras, Ed. Universitaria, 1981, págs. 95 y ss., 252 y ss.; *Caguas Co., Inc.* v. *Mombille*, 58 D.P.R. 300 (1941); *The National City Bank* v. *Sucn. Echevarría*, 50 D.P.R. 865 (1937).

La palabra castellana "prenda" se deriva del verbo latino *prehendere*, [y] significa prender, asir, agarrar una cosa. *Ramos Mimoso* v. *Tribunal Superior*, 93 D.P.R. 551, 555 (1966). Mediante dicho contrato —de constitución formal— se transmite materialmente la cosa pignorada al acreedor, privándose el deudor de la *posesión de la misma*. J.M. Manresa, *Comentarios al Código Civil Español*, 6ta ed. rev., Madrid, Ed. Reus, 1973, T. XII, págs. 583–584. Es cierto que en virtud del Art. 1768 del Código Civil, 31 L.P.R.A. sec. 5027, "[m]ientras no llegue el caso de ser expropiado de la cosa dada en prenda, *el deudor sigue siendo dueño de ella*". (Énfasis suplido.) Pero ello no significa que un pagaré hipotecario al *portador* dado en prenda no tenga unos efectos jurídicos. Art. 383 de la Ley de Instrumentos Negociables, 19 L.P.R.A. sec. 61. Como dijimos en *Vendrell* v. *Torres Aguiló*, 85 D.P.R. 873, 876–877 (1962), "técnicamente de acuerdo con las disposiciones del Art. 1768, el dueño del pagaré lo era el que lo expidió, pero su mera entrega para garantizar una deuda lo había

puesto en circulación, y había surgido a la vida del derecho un documento negociable con valor. Si no fuera así no tendría valor alguno para el que lo recibía en garantía y serían inútiles las disposiciones de ley que autorizan la expedición de pagarés al portador . . . . El contrato de dación en prenda de un pagaré hipotecario constituye un negocio jurídico, por la naturaleza del cual el acreedor prendario adquiere un interés especial en el pagaré". *Cf. Banco Central y Economías* v. *Registrador*, 111 D.P.R. 773, 780 (1981). Debe, pues, el recurrente Reyes para hacer efectivo su crédito adicionar como parte del pleito a los miembros de la sucesión del acreedor prendario, voluntaria o involuntariamente, promover algún acuerdo que le permita readquirir el pagaré o saldar la deuda que grava el pagaré.

Dicha situación es casi idéntica a la que nos ocupa. Dados en prenda los pagarés hipotecarios al portador, el acreedor prendario, como verdadero tenedor de los pagarés, era parte indispensable en el pleito para poder hacer efectivo el crédito. Regla 16 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

Por los fundamentos antes expuestos, *se revocará la sentencia del tribunal de instancia y se desestimará la demanda en ejecución de hipoteca sin perjuicio de que la demandante señora Martínez, luego de cumplir su prestación de inscribir el exceso de cabida, pueda instar otra acción, de ser necesario, mediante la cual se exija el pago de lo adeudado.*

El Juez Asociado Señor Rebollo López no intervino.