TEXTO COMPLETO DE LA SENTENCIA
I
Desde el 1 de febrero de 1999, la señora Nilda Luz Batiz Pereira laboró para Custom Mortgage Corporation (C.M.C.), en el área de mercadeo, originación y cierre de préstamos hipotecarios. Aunque durante dicho período, la relación laboral entre Batiz Pereira y C.M.C., se rigió por un contrato intitulado “Contrato de servicios profesionales” (Contrato) que nunca fue firmado, las partes estipularon que la conducta y relación profesional siempre se circunscribió a lo allí pactado. Sobre la terminación del empleo de Batiz Pereira, el Contrato disponía:
-•-----Veinte TERMINACIÓN: Las partes aquí comparecientes han acordado que el término de este contrato será por un año con opción a renovación automática. No obstante, las partes acuerdan que el mismo podrá terminar por las siguientes:
a) Por opción unilateral de cualquiera de las partes en cualquier momento siempre y cuando se le notifique por escrito y con acuse de recibo a la otra parte con 30 días de anticipación. La CONTRATISTA entiende que una terminación sin la debida notificación podría ser dañina a la COMPAÑÍA debido a la naturaleza de los servicios particulares y especializados envueltos por lo que velará con recelo el cumplimiento de esta disposición.
b) La COMPAÑÍA podrá terminar este contrato sin notificación previa cuando acredite que la CONTRATISTA no ha cumplido con las obligaciones que se le han requerido y luego de haberle inquirido sobre tal cumplimiento, ha fallado en subsanar dichas faltas en un período de 15 días posterior a tal *787 apercibimiento, de ser estas faltas subsanables.
c) La COMPAÑÍA podrá dar por terminado este contrato de inmediato cuando pueda acreditar a la CONTRATISTA mediante medios razonables del comercio, que la actividad profesional para la cual fue contratada ha advenido insolvente o improductiva.
d) La COMPAÑÍA podrá a su discreción terminar el presente contrato y sin notificación previa en la eventualidad de que la CONTRATISTA incurriera en conducta que conlleve negligencia o incumplimiento con las leyes y reglamentos que rigen la industria hipotecaria.” (Énfasis nuestro).
Sobre la compensación que recibiría Batiz Pereira por sus servicios profesionales, el Contrato especificó que devengaría una compensación principal de $8,000.00 mensuales por sus servicios profesionales más $60,000.00 en caso de que ésta lograra originar y cerrar un volumen anual de préstamos hipotecarios equivalentes a $36,000,000.00 con un rendimiento promedio de 4% o más. Esta suma sería computada dentro de quince (15) días de haber cerrado el año del Contrato y pagadera dentro de los quince (15) días subsiguientes a ser notificado a Batiz Pereira.
En marzo de 2000, una investigación iniciada por el United States Department of Agriculture (en adelante, U. S.D.A.), [1] sobre la falsificación de un documento en el caso de Randy E. López Montalvo, atendido por Batiz Pereira, provocó que el 29 de marzo del 2000, terminara la relación contractual entre las partes. La cesantía de Batiz Pereira se produjo luego de notificársele la intención de prescindir de sus servicios, según estipulaba el Contrato. A raíz de ello, el 5 de septiembre de 2001, Batiz Pereira y su esposo Gamalier Rodríguez Mercado, presentaron Demanda sobre incumplimiento de contrato, cobro de dinero y daños y perjuicios al amparo de los Arts. 1802 y 1803 del Código Civil de Puerto Rico contra C.M.C., José L. Cortés Vega y otros.
Por su parte, el 3 de diciembre de 2001, C.M.C. presentó Demanda de entredicho provisional y daños y perjuicios (Núm. KPE2001-2522), contra los esposos Rodríguez Batiz. Alegaron que la presentación de una anotación de demanda ante el Registro de la Propiedad por parte de los esposos Rodríguez Batiz interfirió contractualmente en las negociaciones sobre la venta de su propiedad a Doral Bank. Según ellos, dicha acción les afectó perniciosamente al tener que vender el inmueble por un valor menor, sufrir la retención de una suma de $50,000.00 para responder en caso de litigio, la difamación y el menoscabo del haber corporativo. El 6 de diciembre de 2001, los esposos Rodríguez Batiz respondieron a la Demanda. En la Conferencia con Antelación al Juicio celebrada el 18 de noviembre de 2004, las partes solicitaron y el Tribunal de Instancia accedió a consolidar los pleitos. Finalmente, el 3 de junio de 2005, C.M.C. y otros, presentaron su alegación responsiva.
El 25 y 26 de marzo de 2008, se llevó a cabo el juicio en el que Batiz Pereira declaró sobre sus experiencias de trabajo, los reconocimientos obtenidos en la industria bancaria, el contenido del Contrato que regulaba sus relaciones laborales con C.M.C. y sus funciones en dicho lugar. Narró los hechos que suscitaron su despido, vinculados directamente con el documento ilegalmente alterado en una solicitud de préstamo hipotecario que ella supervisó. Su esposo, el señor Rodríguez Mercado, intentó declarar sobre los daños sufridos por la cesantía de su esposa, sin embargo, C.M.C., objetó con éxito su testimonio fundado en que su causa de acción estaba prescrita.
Tras culminar el juicio, el 9 de julio de 2008, el Tribunal, (Hon. Gloria M. Soto Burgos), dictó Sentencia declarando Con Lugar la Demanda. Específicamente, determinó que la forma en que se efectuó el despido de Batiz Pereira constituyó un incumplimiento contractual que conllevaba indemnizarle por los daños y perjuicios que hubiese causado. Estimó en $8,000.00 la compensación principal más $60,000.00 la compensación adicional, según disponía el Contrato y concedió $20,000.00 por los daños morales y angustias mentales sufridos por los esposos Rodríguez Batiz. Distribuyó éstos en $10,000.00 a favor de Batiz Pereira, $5,000.00 a favor de la Sociedad Legal de Gananciales compuesta por ella y su esposo y $5,000.00 para el señor Rodríguez Mercado. El 25 de agosto de 2008, C.M.C. y otros, presentaron moción sobre determinaciones de hechos adicionales bajo el *788 palio de la Regla 43.3 de Procedimiento Civil. El 10 de septiembre, el Tribunal la declaró No Ha Lugar.
Inconformes, el 15 de octubre de 2008, C.M.C. y otros, acudieron ante nos mediante recurso de Apelación. [2] En cuanto a la compensación de $8,000.00, equivalente a treinta (30) días de trabajo, arguyen que Batiz Pereira no tenía derecho a recibirla, pues el Contrato únicamente requería una notificación con treinta (30) días de anticipación en caso de que cualquiera de las partes decidiera unilateralmente terminarlo. En relación a la compensación de $60,000.00, sostienen que procedía, sólo si Batiz Pereira hubiese generado un volumen de negocios de $36,000,000.00, entre el 1 de febrero de 1999 al 29 de marzo de 2000. Contrario a ello, la prueba desfilada en el juicio demostró que el volumen de negocios generado por Batiz Pereira fue de $27,661,463.00.
Con relación a las compensaciones por daños morales y angustias mentales de $10,000.00 y $5,000.00, C.M. C. y otros alegan su improcedencia. Sostienen que las partes tenían derecho a resolver el Contrato, por lo que no existió violación alguna. Alegan, además, que no se probaron dichos daños. Sobre los daños morales y angustias mentales concedidos a favor de la Sociedad Legal de Gananciales compuesta por los esposos Rodríguez Batiz, también argumentan que no proceden, pues se trata de daños que pertenecen a los individuos, y no daños pecuniarios que sí corresponderían a dicha Sociedad. Además, señalan que procedía la desestimación de la Demanda en contra del apelante José L. Cortés Vega, pues éste, al despedir a Batiz Pereira, actuó en nombre y representación de la Corporación y no se alegó ni probó su negligencia personal. Como último error alegan que procedía la Demanda de daños y perjuicios presentada por ellos.
El 14 de noviembre de 2008, los esposos Rodríguez Batiz presentaron su alegato. Con el beneficio de la comparecencia de las partes, la transcripción de los procedimientos, el derecho y la jurisprudencia aplicable, resolvemos.
n
Los contratos se originan desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio. Art. 1206 del Código Civil, 31 L.P.R.A. § 3371; Amador Parrilla v. Concilio Iglesia Universal, 150 D.P.R. 571, 581 (2000). Nuestro Código Civil consagra en su Art. 1207, el derecho a la libertad en la contratación. En virtud de éste, las partes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarias a las leyes, a la moral, ni al orden público. Art. 1207 Código Civil, 31 L.P.R.A. § 3372; SLG Irizarry v. SLG García, 155 D.P.R. 713, 724 (2001); Trinidad García v. Chade, 153 D.P.R. 280, 289 (2001); Amador Parrilla v. Concilio Iglesia Universal, supra, a la pág. 582; C.N.A. Casualty de P.R. v. Torres Díaz, 141 D.P.R. 27, 38 (1996). La existencia, validez y obligatoriedad de las obligaciones contractuales depende de la concurrencia de: (a) consentimiento de los contratantes; (b) el objeto cierto que sea materia del contrato, y (c) la causa de la obligación que se establezca. Arts. 1213 y 1230 del Código Civil, 31 L.P.R.A. §§ 3391; 3451; Díaz Ayala v. E.L.A., 153 D.P.R. 675, 690-691 (2001).
Las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos. Art. 1044 del Código Civil, 31 L.P.R.A. § 2994. Los contratos como negocios jurídicos bilaterales que constituyen fuentes de obligaciones —Amador Parrilla v. Concilio Iglesia Universal, supra, a la pág. 581 — , no solamente obligan a lo pactado, sino también a toda consecuencia que sea conforme a la buena fe, al uso y a la ley. Art. 1210, Código Civil, 31 L.P.R.A. § 3375; SLG Irizarry v. SLG García, supra, a la pág. 725. De conformidad con el principio rector de pacta sunt servanda, las partes contratantes se obligan a todos los extremos de lo pactado que sean conformes a la ley, a la moral y al orden público. Ninguna parte puede exigir el cumplimiento de una obligación contraria sin antes cumplir o intentar cumplir su propia obligación. Martínez v. Colón Franco, Concepción, 125 D.P.R. 15, 33 (1989). Ahora bien, es menester que la obligación incumplida sea esencial o que su cumplimiento constituya el motivo del contrato para la otra parte.
En el caso de marras existió un Contrato de Servicios Profesionales, aunque no suscrito por las partes, pero *789 con el que ambas estuvieron de acuerdo en cumplir. [3] La Cláusula Veinte sobre terminación, en particular su inciso (d), concedía discreción a C.M.C. de “terminar el presente contrato y sin notificación previa en la eventualidad de que la CONTRATISTA incurriera en conducta que conlleve negligencia o incumplimiento con las leyes y reglamentos que rigen la industria hipotecaria.” (Enfasis nuestro). Anejo XVI, a las págs. DBMS.
Según se desprende del expediente ante nos, consistente de los documentos presentados y admitidos en evidencia por el Tribunal, los escritos de las partes y la transcripción de la vista oral, la terminación del Contrato por parte de C.M.C. obedeció precisamente a la conducta negligente incurrida por Batiz Pereira. La experiencia y conocimientos de Batiz Pereira en la industria de la Banca, particularmente, en la originación, procesamiento y aprobación de préstamos, permite cuanto menos concluir que medió negligencia de su parte en la transacción que provocó la terminación de su Contrato. El tracto procesal pertinente del incidente comienza con la presentación para evaluación de una solicitud de préstamo del señor Randy E. López Montalvo acompañada con una certificación de empleo consignando 40 horas de trabajo. (TP, a las págs. 78-79). Evaluado el caso, Batiz Pereira lo refirió a U.S.D.A. para su aprobación. U.S.D.A. obtuvo una verificación de sueldo sustentada por talonarios que reflejaban sólo 32 horas de trabajo en lugar de 40. Ante la discrepancia, funcionarios de U.S.D.A. se comunicaron con Batiz Pereira, —TP, a las págs. 80-81 — , tras lo cual, ésta solicitó el expediente y previa comparación de la certificación con la verificación, corrigió las cuantías y sometió nuevamente la documentación a U.S.D.A. (TP, a la págs. 82-84). Al hacerlo, ignoró lo que conspicuamente parecían alteraciones al documento de verificación de sueldo. Los borrones en los espacios referentes a las partidas, precisamente, de los ingresos, bonos y horas extras trabajadas por el solicitante, eran evidentes. (TP, a la págs. 11-12). Anejo XXI, a la pág. 159. Verificados todos los documentos una vez más, U.S.D.A. se comunicó con el patrono del solicitante -Intel — , quien le confirmó que la verificación expedida por ellos no coincidía con la información recibida por U.S.D.A. (TP, a la pág. 22). Al remitírsele nuevamente la verificación, se confirmó que la primera verificación había sido alterada.
La negligencia por parte de Batiz Pereira que dio lugar a la terminación de su relación contractual con C.M. C., consistió, no en la falsificación del documento, sino en la forma descuidada en que revisó y evaluó los documentos, en particular las verificaciones de empleo y salario, de la solicitud del préstamo ante su consideración. Precisamente su responsabilidad como suscriptora de valores hipotecarios o underwriter, según surge del expediente y la transcripción de los procedimientos, era analizar toda la documentación sometida por el solicitante y darle una pre-aprobación final al préstamo, a base de los parámetros de crédito e ingreso. (TP, a las págs. 30-31). En esencia, las funciones de Batiz Pereira requerían un alto grado de cuidado y diligencia respecto al análisis de cada uno de los documentos que acompañaban la solicitud de préstamo, aptitudes que en este caso no fueron observadas adecuadamente por lo que se justificaba su despido.
Resulta forzoso concluir que incidió el Tribunal recurrido, al determinar que hubo incumplimiento de Contrato por parte de C.M.C. Al así determinarlo, incorrectamente se basó en la cláusula que permitía la terminación de la relación contractual “[p]or opción unilateral de cualquiera de las partes en cualquier momento siempre y cuando se le notifique por escrito con acuse de recibo a la otra parte con 30 días de anticipación”. Esta cláusula, sin embargo, respondía al interés de C.M.C. de evitar “que una terminación sin la debida notificación [...] dañ[ara] a la COMPAÑIA debido a la naturaleza de los servicios particulares y especializados envueltos por lo que velar[ía] con recelo el cumplimiento de esta disposición”. Se basó además, igualmente errónea, en que el inciso (b) de la Cláusula Veinte obligaba a C.M.C., en caso de algún incumplimiento de las obligaciones de Batiz Pereira, inquirir sobre el mismo y concederle un término de 15 días para subsanar la falla de ser subsanable.
Ninguna de estas cláusulas incidía en el caso en que Batiz Pereira incurriera en negligencia en el ejercicio de sus funciones. El inciso (d) de la Cláusula Veinte del Contrato, en cambio, sí estableció diáfanamente, la discreción de C.M.C. de “terminar el presente contrato y sin notificación previa en la eventualidad de que la CONTRATISTA incurriera en conducta que conlleve negligencia o incumplimiento con las leyes y *790 reglamentos que rigen la industria hipotecaria.” En el ejercicio legítimo de sus prerrogativas dimanantes de este inciso, C.M.C. decidió dar por terminado el Contrato, luego de entender que Batiz Pereira incurrió en negligencia que puso en riesgo la estabilidad y bienestar de la Compañía.
Con nuestro dictamen no ignoramos el alcance de la revisión judicial sobre las cuestiones de hecho, según estatuido reglamentaria -Regla 43.2 de Procedimiento Civil, 32 L.P.R.A. Ap. Ill, R. 43.2 — , y jurisprudencialmente. La intríngulis decisoria del foro recurrido, se basó en la fácultad de C.M.C. de terminar unilateralmente el contrato, aunque erróneamente el Tribunal aplicó la Cláusula Veinte (a) que exigía notificación con treinta (30) días de antelación a Batiz Pereira. No subvertimos, por tanto, las determinaciones de hechos a las que llegó el Foro de Instancia; más bien resolvemos que incidió al aplicar la cláusula de terminación contractual incorrecta. De hecho, en la sentencia nada hay que indique que el Foro a quo eximiera a Batiz Pereira de la negligencia en el cumplimiento de sus deberes y que dio paso a la terminación de su contrato, en virtud de la Cláusula Veinte (d).
III
Con relación a la compensación adicional por el volumen de préstamos cerrados, la prueba desfilada en el juicio [4] demostró que a marzo de 2000, C.M.C. informó un volumen anual de cierre de préstamos hipotecarios que sobrepasaba los $36,000,000.00, cantidad requerida en el Contrato para hacer acreedora a Batiz Pereira del citado incentivo. (TP, a las págs. 102-111, 114, 116, 123-127, 226). Siendo ello así, correspondía reconocerle el incentivo contractual de $60,000 a Batiz Pereira, por lo que no incidió el Tribunal en ese error.
IV
En relación al noveno y último señalamiento de error presentado por C.M.C. resulta apropiado destacar que durante el juicio éstos no presentaron evidencia sobre el nexo causal entre la solicitud de anotación de demanda y la venta del inmueble por un precio menor a VIG Mortgage. Según el testimonio del señor Cortés Vega, su situación de salud fue el motivo principal de su interés y premura en vender los activos de C.M.C. (TP, a las págs. 55, 75). La determinación de vender el inmueble por un precio menor al originalmente pensado fue una decisión del señor Cortés Vega en la cual no interfirió Batiz Pereira, pues como bien reconocieran en la escritura de compraventa, la solicitud de anotación de demanda presentada ante el Registro de Propiedad no era conforme a derecho, pues carecía de una orden judicial que así la autorizare. (TP, a las págs. 63-64, 98). Así también, quedó demostrado ante el Foro recurrido que la tardanza en la devolución de la cuantía de cincuenta mil ($50,000.00) dólares retenida, no se debió a ninguna actuación de Batiz Pereira, sino al procedimiento establecido para ello por la aseguradora. (TP, a las págs. 100-102). Al no presentarse prueba sobre los elementos de la causa de acción en daños y perjuicios, lo procedente era desestimar la reclamación como bien determinara el Tribunal de Instancia.
V
Por los fundamentos antes expuestos, modificamos la Sentencia dictada el 9 de julio de 2008, por el Tribunal de Primera Instancia, Sala de San Juan, a los fines de eliminar la compensación de ocho mil ($8,000.00) dólares por terminación de contrato sin previa notificación, así como la partida de veinte mil ($20,000.00) dólares por los daños morales y angustias mentales. Así modificada, se confirma en cuanto a sus demás extremos. La Juez García García emitió voto disidente por escrito.
Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones
ESCOLIOS 2009 DTA 23
*791 VOTO DISIDENTE DE LA JUEZ DE APELACIONES SRA. GARCÍA GARCÍA - 2010 DTA 23
San Juan, Puerto Rico, a 3 de noviembre de 2009
En la Sentencia de este Foro, el panel indica que no ignora el alcance de la revisión judicial que promulga que no debemos intervenir con las determinaciones de hechos que haga el Tribunal de Instancia. Reconoce, además, que no debemos sustituir nuestro criterio por el del juzgador ante quien declararon los testigos y que tuvo la oportunidad de verlos declarar y apreciar su comportamiento (“demeanor”). La normativa que reconocen mis compañeros de panel sólo debe ceder cuando existe prueba de que el tribunal actuó con pasión, prejuicio, parcialidad o incurrió en error manifiesto.
Luego de revisar el expediente del caso y la transcripción de la vista, no encuentro indicio alguno de que el Tribunal de Primera Instancia (TPI) actuó con prejuicio o parcialidad, abusó de su discreción o se equivocó en la interpretación de una norma procesal o de derecho sustantivo. Colón v. Lotería, 167 D.P.R. 625, 658 (2006). Al igual que ellos, reconozco la normativa sobre el alcance de la revisión judicial y por ello disiento. Una lectura de la transcripción de la vista y de la prueba documental me permite concluir que el TPI no erró y que debemos confirmar su Sentencia.
Una de las funciones de este tribunal revisor es corregir errores del tribunal sentenciador, De Jesús Viñas v. González Lugo, Opinión del 9 de marzo de 2007, 2007 J.T.S. 48. Ello requiere que la razón para revocar surja claramente de lo ocurrido durante la vista del caso. Incluso, si existiera un error, como expresó el hoy fenecido Juez Asociado Fuster Belingerie, en su opinión disidente en Ramos Milano v. Wal-Mart, 168 D.P.R. 112, 123-124 (2006), éste no implica que hubo prejuicio, parcialidad o abuso de discreción.
Durante su testimonio, la apelada Batiz Pereira dio su versión sobre el incidente que provocó la separación de su empleo. El 29 de mazo, se le entregó una carta con fecha de 30, mediante la cual se prescindió de sus servicios. Se le informó que había una irregularidad en los documentos de un préstamo hipotecario de un cliente. Se le mostró una verificación de empleo; se le indicó que ésta había sido alterada; y que ella debió percatarse que el documento estaba alterado. (I Tr., págs. 75-77).
El documento que tenía cómputos hechos por ella no fue el que se sometió a la agencia federal. Lo que se sometió fue una verificación de Intel que fue el documento que ella evaluó antes de que fuera para la agencia federal. (I Tr., págs. 77-78). Explicó que cuando el caso llegó a la agencia, allá se percatan que los talonarios de pago del cliente no coincidían con la certificación de Intel y la llaman. Ella pidió el expediente y se pidió otra verificación a Intel. Mientras, ella hizo la corrección pertinente en el documento identificado como certificación. La segunda verificación de Intel, ella la ve cuando el señor Cortés se la mostró el día del despido; esa fue la primera vez que la vio. (I Tr., págs. 82-83). Ante el planteamiento del apelante de que ella no se percató que la segunda verificación contrastaba con la primera, la apelada explicó que ella no tuvo las dos verificaciones ante sí hasta que pudo ver todos los documentos durante el proceso en la agencia federal.
La apelada explicó que la irregularidad se podía aclarar si lfe hubiesen dado los quince (15) días que decía el contrato para subsanar falta. (I Tr., págs. 147-148). Con un expediente para poder evaluar lo que se le estaba *792 imputando, ella podía explicar lo ocurrido. De este modo, todos se hubiesen percatado que el error venía o surgía de la misma corporación Intel, que era quien se los hacía llegar. (I Tr., págs. 49-150).
El procedimiento que se llevó en la agencia federal lo inició una queja que llevó “Custom”, su patrono. (I Tr., pág. 171). Ello se desprende de unas cartas a la agencia. La testigo entiende que “Custom” debió investigar primero internamente antes de enviar la carta a la agencia. (I Tr., págs. 183-187).
El único testigo de la parte apelante en la reclamación de la apelada en contra de “Custom Mortgage” lo fue el Sr. José Luis Cortés Viera, hijo. Este testificó que la agencia federal los llamó. Su padre y él fueron personalmente a la agencia porque se habían falsificado unos documentos. (II Tr., págs. 7). Hicieron una investigación sin informar o entrevistar a la apelada. (II Tr., págs. 15). Él y su padre no pueden decir que la persona que alteró el documento fue la procesadora o la apelada, pero como la apelada era la responsable, su padre tomó la decisión de despedirla. (II Tr., págs. 15-16). Aunque él se reunió con la procesadora, no pudo recordar su nombre. (II Tr., pág. 28). Cree que ésta no fue despedida. (II Tr., pág. 30).
Durante el contra interrogatorio, el testigo aclaró que a quien la agencia federal llamó fue a su padre. [1] (II Tr., pág. 20). Cuando su padre habló con él, tenía los documentos en su mano. (II Tr., pág. 20). Él ni su padre llamaron a la persona en Intel que originó los dos documentos contradictorios. Él día de la vista, el testigo manifestó que no podía decir quién había “falsificado” una de las dos verificaciones de empleo. (II Tr., págs. 23 y 29).
La revisión total de la transcripción me lleva a concluir que las determinaciones de hechos del TPI se sostienen con la prueba. De ésta no se desprende que la Juez que presidió la vista actuó con prejuicio, o que hubiese errado en la interpretación de derecho, habiendo estipulado las partes que la relación laboral era una por tiempo determinado regida por los términos recogidos en un documento. Su interpretación de dicho documento fue que conforme a las alegaciones y a la prueba el inciso del documento que aplicaba a la situación era el (b), que requería un apercibimiento de un incumplimiento con alguna obligación y la concesión de quince (15) días a la persona imputada para subsanar, de ser la falta subsanable.
La prueba estipulada y la testifical no establecen que la apelada falsificara un documento. Se demostró que hubo una irregularidad en la verificación de empleo en un caso, dado que en una verificación se reflejaba un salario del cliente a base de 40 horas, mientras el talonario de pago reflejaba que éste no trabajaba regularmente 40 horas. A veces trabajaba horas extras y recibía un bono. Esa fue la explicación que ofreció la apelada y nada encontramos en el expediente en la transcripción que desmienta su versión. El testigo de “Custom” indicó que no sabía quién había cambiado la información en la segunda verificación de empleo que sometió Intel y no explicó si el cambio de salario a base de 40 horas a uno a base de 32 horas era incorrecto. Aunque insinuó que el cambio se hizo para que el cliente cualificara para un préstamo que requería no exceder determinado ingreso, no probó que la jomada semanal del empleado realmente fuera de 40 horas y no de 32. Repetimos que el testigo indicó que no se llamó a Intel para verificar los documentos desiguales.
Por último, precisa señalar que la investigación que realizó la agencia no tuvo consecuencia, pues su explicación concluyó el asunto. Tal como arguye la apelada, si durante la investigación que realizó “Custom” se le hubiese permitido explicar, todo se hubiese aclarado. La teoría de los apelantes era que la apelada por ser la “underwriter” debió percatarse de la diferencia en las dos verificaciones de empleo. Mientras que ésta explicó que no tuvo ante sí dos verificaciones distintas. Cuando la llamaron de la agencia federal sobre la primera verificación y los comprobantes de pago, buscó el expediente, se percató que la cantidad informada en la verificación no coincidía con los talonarios y procedió a hacer las correcciones a mano en la certificación.
De otra parte, la conclusión del TPI de que la parte apelante “fue negligente y no realizó la debida negligencia para investigar, prever y evitar las consecuencias naturales y ordinarias de terminar el contrato *793 contrario a los términos acordados”, también está apoyada por la prueba.
Por las razones expresadas, confirmaría la Sentencia del TPI. No existe razón para intervenir con la apreciación de la prueba que hizo la Juez que tuvo ante sí los testigos y que pudo evaluar su comportamiento en sala, así como la prueba documental. Por ello, disiento.
EMMALIND GARCÍA GARCÍA
Juez de Apelaciones
ESCOLIO DEL VOTO DISIDENTE DE LA JUEZ DE APELACIONES HON. GARCÍA GARCÍA - 2010 DTA 23

1. Agencia federal que concede préstamos hipotecarios a personas con ingresos limitados.

. Este caso nos fue asignado el 16 de julio de 2009, mediante la Orden Administrativa Núm. TA-2009-250.

. Dicho Contrato fue estipulado durante el proceso judicial e identificado como Exhibit 1.

. Durante el juicio se estipularon varios documentos entre ellos el Exhibit 7 consistente de un Informe rendido por C.M.C. al Comisionado de Instituciones Financieras con la cantidad de préstamos suscritos durante el período en que Batiz Pereira laboraba para ellos como suscriptora de valores hipotecarios o underwriter.

. El señor Cortés, padre, no se presentó como testigo en esta reclamación.