Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| VÍCTOR ADOLFO MARCIAL VEGA, IVETTE DE LOS ÁNGELES MARCIAL VEGA, IVONNE MARÍA MARCIAL VEGA, JUAN CARLOS MARCIAL VEGA, MARÍA EUGENIA MARCIAL VEGA<br><br>Apelados<br><br>v.<br><br>MARÍA IVELISSE MARTÍNEZ COLÓN, CHIARA IVELISSE MARCIAL MARTÍNEZ, VÍCTOR MANUEL MARCIAL MARTÍNEZ<br><br>**LUISA VANESSA MARCIAL VEGA**<br><br>Apelante | KLCE202401025 | *Certiorari,* **acogido como APELACIÓN** procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Civil Núm.: K AC2016-0064<br><br>Sobre: Partición de Herencia Remoción de Albacea Nombramiento de Administrador Judicial |

Panel integrado por su presidenta la Jueza Romero García[1], la Jueza Santiago Calderón y la Jueza Álvarez Esnard

Álvarez Esnard, jueza ponente

## SENTENCIA

En San Juan, Puerto Rico, a 9 de diciembre de 2024.

Comparece ante nos la señora Luisa Vanessa Marcial Vega ("señora Luisa Marcial" o "Apelante") mediante escrito intitulado *Petición de Certiorari* recibido el 23 de septiembre de 2024. Nos solicita que revoquemos la *Sentencia Parcial* dictada el 10 de julio de 2024 y notificada el 30 de julio del mismo año, por el Tribunal de Primera Instancia, Sala Superior de San Juan ("foro primario" o "foro *a quo*"). Mediante el aludido dictamen, el foro primario declaró *Ha Lugar* la solicitud de sentencia sumaria instada por la señora María Martínez Colón ("señora Martínez Colón" o "Albacea") y sus hijos Chiara y Víctor Marcial Martínez ("hermanos Marcial Martínez") (en

---

[1] Mediante Orden Administrativa OATA-2024-134 se designa a la Hon. Giselle Romero García en sustitución del Hon. Ángel R. Pagán Ocasio.

conjunto, "los Apelados"). En consecuencia, se le ordenó a la Apelante el pago de varias deudas reclamadas al caudal hereditario del señor Víctor Marcial Burgos ("señor Marcial Burgos" o "Causante").

Por los fundamentos que expondremos a continuación, **confirmamos** la *Sentencia* apelada.

## I.

El 12 de febrero de 2016 Víctor Adolfo Marcial Vega, Ivette de los Ángeles Marcial Vega, Ivonne María Marcial Vega, Juan Carlos Marcial Vega y María Eugenia Marcial Vega instaron *Demanda* sobre partición de herencia, remoción de albacea y nombramiento de administrador judicial contra la señora Martínez Colón, los hermanos Marcial Martínez y la Apelante.[2] Mediante la aludida *Demanda*, los demandantes manifestaron ser hermanos e hijos entre sí del señor Marcial Burgos. Adujeron que el señor Marcial Burgos contrajo primeras nupcias con la señora María Vega Carrasquillo y con ella procreó seis (6) hijos. Alegaron que posteriormente, la señora Vega Carrasquillo falleció y el señor Marcial Burgos contrajo segundas nupcias con la señora Martínez Colón.

De igual manera, de la *Demanda* se desprende que, el 27 de septiembre de 2008, el señor Marcial Burgos otorgó *Escritura de Testamento* en la cual, entre otras cosas, nombró a la señora Martínez Colón como su albacea. No obstante, surge de la *Demanda* que el señor Marcial Burgos y la señora Martínez Colón tuvieron varias pugnas judiciales a tal nivel que el Causante abandonó su residencia por un alegado patrón de maltrato por parte de su cónyuge. Ante este escenario, los demandantes argumentaron que la señora Martínez Colón no era la persona indicada para ejercer el

---

[2] Véase, apéndice del recurso, págs. 1-7.

puesto de albacea del caudal hereditario del señor Marcial Burgos, toda vez que esta había incumplido con las obligaciones que exigían dicho puesto. Por tanto, solicitaron su remoción de dicho cargo; que se designara un contador partidor para los trámites pendientes; que se nombrara un administrador judicial y que se ordenara la partición de la herencia conforme a derecho.

Por su parte, el 8 de abril de 2016, la Apelante presentó *Contestación a Demanda.*[3] Mediante esta, en esencia, coincidió con los argumentos contenidos en la *Demanda* y solicitó la descalificación de la señora Martínez Colón del puesto de albacea. Por su lado, el 7 de abril de 2016, la señora Martínez Colón presentó *Contestación a la Demanda, Defensas Afirmativas y Especiales y Reconvención.*[4] Mediante esta, negó ciertas alegaciones y levantó sus correspondientes defensas afirmativas. Asimismo, instó una reconvención mediante la cual le solicitó a la señora Ivette de los Ángeles Marcial Vega el pago de tres mil seiscientos dólares ($3,600.00), más intereses y a la señora Ivonne María Marcial Vega la cuantía de seis mil dólares ($6,000.00) más los intereses aplicables.

Del mismo modo, el 8 de julio de 2016, la señora Martínez Colón incoó *Demanda contra Coparte* contra la señora Luisa Marcial.[5] Afirmó que esta reclamación la hacía en calidad albacea y administradora testamentaria del caudal hereditario del señor Marcial Burgos. En ese sentido, presentó cuatro (4) reclamaciones contra la Apelante. La primera reclamación versaba sobre una corporación doméstica llamada Colonial Realty, Inc., en la cual, la Apelante y su padre, el señor Marcia Burgos, eran los únicos accionistas. La señora Martínez Colón esbozó que el 15 de marzo de

---

[3] *Íd.,* págs. 8-15.
[4] *Íd.,* págs. 16-34.
[5] *Íd.,* págs. 78-91.

1993, la señora Luisa Marcial le compró la otra mitad de las acciones a su padre. Alegó que la compra de las acciones, la cual se hizo mediante contrato de compraventa de acciones, valoraba la transacción en trecientos ochenta mil dólares ($380,000.00). No empece a esto, agregó que la Apelante únicamente le pagó diez mil dólares ($10,000.00), adeudándole al Causante trecientos setenta mil dólares ($370,000.00), los cuales correspondería pagar al caudal hereditario. Añadió que, debido a los intereses que se fueron acumulando, este monto ascendía a ochocientos sesenta y tres mil ciento cuarenta y cuatro dólares con once centavos ($863,144.11), la cual sostuvo que era una deuda líquida, vencida y exigible.

Del mismo modo, la segunda reclamación giraba en torno a otra corporación denominada como Marcial Radiation Oncology Center, PSC, ("MROC, PSC") de la cual eran dueños en partes iguales la Apelante y el Causante. La Albacea destacó, que estos contrajeron una deuda con Medicare durante los años 2000 al 2002 por ochocientos ochenta y tres mil ciento veinticinco dólares con veintinueve centavos ($883,125.29) por concepto de sobrefacturación a dicha agencia. Enfatizó que, tras varios pleitos judiciales, el Causante y la Apelante, por conducto MROC, PSC pagaron cuatrocientos cuarenta y tres ciento veinticinco dólares con veintinueve centavos ($443,125.29), quedando pendiente de pagar cuatrocientos cincuenta mil dólares ($450,000.00). Expuso que este monto restante fue pagado por la Apelante mediante un préstamo que hizo al Causante y en el cual se pactó que la señora Luisa Marcial debía rembolsarle la mitad de dicha cuantía, es decir, doscientos veinticinco mil dólares ($225,000.00), cuantía que nunca pagó. Por lo cual, la señora Martínez Colón solicitó el pago de dicha deuda, más los intereses aplicables.

En cuanto la tercera reclamación, la señora Martínez Colón explicó que la señora Luisa Marcial y su padre el señor Marcial

Burgos constituyeron la sociedad especial MROC, SE, en la cual eran socios en partes iguales. Argumentó que esa sociedad adquirió una propiedad sita en el municipio de Fajardo valorada en trescientos diez mil dólares ($310,000.00). Indicó que el Causante invirtió con su dinero privativo cuarenta y tres mil cuatrocientos treinta y seis dólares con noventa y dos centavos ($43,436.92) como precio de opción para adquirir la propiedad y el resto fue pagado mediante un préstamo hipotecario. Aclaró que el señor Marcial Burgos saldó el principal del préstamo, el cual ascendía a doscientos nueve mil dólares seiscientos doce dólares ($209,612.00). Igualmente, la albacea sostuvo que al fallecer el señor Marcial Burgos, esta sociedad especial no quedó disuelta, por lo cual la participación del Causante pasó al caudal hereditario. En tal sentido, esgrimió que la Apelante le adeudaba a dicho caudal la mitad del dinero privativo que invirtió el Causante para la adquisición del solar, el cual ascendía a ciento veintiséis mil quinientos veinticuatro dólares con cuarenta y seis centavos ($126,524.46), la cual adujo que era una deuda líquida, vencida y exigible.

Finalmente, la cuarta reclamación versaba sobre la deuda del Centro de Recaudaciones de Ingresos Municipales ("CRIM") que tenía el solar perteneciente a la sociedad especial MROC, SE. En respuesta, el 10 de noviembre de 2016, la Apelante presentó *Contestación a Demanda contra Coparte, Moción de Desestimación y Reconvenciones.*[6] Mediante esta, negó algunas de las alegaciones expuestas por la señora Martínez Colón y levantó las defensas afirmativas correspondientes. A su vez, instó cuatro (4) reconvenciones las cuales trataban esencialmente sobre pagos en exceso para servicios legales y presuntas gestiones innecesarias, las cuales la Albacea debía repagar al causal hereditario.

---

[6] *Íd.,* págs. 92-112.

Tras varios trámites procesales, que son innecesarios detallar, el 23 de febrero 2024, la señora Martínez Colón y los hermanos Marcial Martínez presentaron *Moción Solicitando Sentencia Sumaria.*[7] Mediante esta, solicitó varios remedios relacionados a distintas reclamaciones. En lo pertinente, sostuvieron que la Apelante admitió haber recibido tres (3) préstamos de su padre por ciento cuarenta mil dólares ($140,000.00), diez mil dólares ($10,000.00) y cinco mil dólares ($5,000.00), de los cuales únicamente la señora Luisa Marcial había repagado sesenta mil trecientos dólares ($60,300.00) contra el principal de la deuda de ciento cuarenta mil dólares ($140,000.00), adeudando ochenta y ocho mil trecientos cuarenta y seis dólares con noventa centavos ($88,346.90), en principal, y treinta y nueve mil dólares novecientos ochenta y seis dólares con cincuenta y cuatro centavos ($39,986.54) en concepto de intereses; diez mil dólares ($10,000.00), más tres mil ochocientos setenta y cuatro dólares con doce centavos ($3,874.12) en intereses y cinco mil dólares ($5,000.00), más mil novecientos veintitrés dólares con cincuenta y seis centavos ($1,923.56).

Asimismo, reiteraron que la Apelante adeudaba doscientos siete mil trecientos cincuenta dólares con veintisiete centavos ($207,350.27) al caudal en concepto de principal y setenta y nueve mil setecientos setenta ($79,770.00) en concepto de intereses por la deuda relacionada al sobrepago de Medicare, la cual fue saldada por el Causante. Finalmente, alegaron que la Apelante adeudada ciento veinte seis mil doscientos cincuenta y cuatro dólares con cuarenta y seis centavos ($126,254.46) al caudal por concepto de principal y cuarenta y ocho mil quinientos setenta y uno con sesenta y cuatro centavos ($48,571.64) en intereses por su impago a su porción

---

[7] *Íd.,* págs. 386-463.

referente a la adquisición del solar por parte de la sociedad especial MROC SE.

Por su parte, el 28 de febrero de 2024, la Apelante presentó *Solicitud de Sentencia Sumaria.*[8] En esta, esgrimió que las reclamaciones de la señora Martínez Colón violentaban el principio fundamental de la voluntad del causante quien, mediante su testamento dispensó la colación de los herederos en la legítima y mejora de todo su caudal relicto en todo aquello que hubieran recibido del testador en vida como donación regalo o cualquier otra a título lucrativo. Bajo este fundamento, recalcó que dicha dispensa de colación incluía todas las presuntas deudas reclamadas en la demanda contra coparte y se debía determinar no colacionables los préstamos a la Apelante conforme lo dispone el testamento. Asimismo, puntualizó que todas las deudas alegadas estaban prescritas y que había otras dudas que no existían y, que, de existir, las mismas estaban condonadas por la dispensa de colación, ya que el Causante nunca llevó a cabo ningún tipo de gestión de cobro.

Por su lado, el 19 de marzo de 2024, la Apelante presentó *Réplica a Moción Solicitando Sentencia Sumaria.*[9] En esta, reiteró que, en el caso de marras, existía una dispensa de colación hecha por el Causante la cual incluía las alegadas deudas reclamadas, y además, dichas deudas estaban prescritas, condonadas o no existían. Por tal motivo, solicitó que se declarara *Ha Lugar* la moción de sentencia sumaria presentada por esta y declarara *No Ha Lugar* la moción de sentencia sumaria presentada por la Albacea. Por su parte, los Apelados instaron una *Réplica Consolidada a Oposiciones de Sentencia Sumaria.*[10] Conforme surge del escrito antes mencionado, adujeron que dicho escrito respondía a la oposición de

---

[8] *Íd.,* págs. 357-384.
[9] *Íd.,* págs. 1913-1925.
[10] *Íd.,* págs. 1926-1945.

sentencia sumaria presentada el 20 de marzo de 2024 por Víctor Adolfo, Juan Carlos y María Eugenia Marcial Vega y el escrito que presentó la Apelante el 19 de marzo de 2024.[11] Esencialmente, destacó que las oposiciones no cumplían con las formalidades de la Regla 36.3 (b) de Procedimiento Civil, *infra*, y, por tanto, no lograron rebatir ninguno de los hechos presentados en la solicitud de sentencia sumaria de la Albacea. Igualmente, el 25 de abril de 2024, la Apelante presentó *Dúplica a Réplica Consolidada a Oposiciones a Sentencia Sumaria.*[12] En este escrito, subrayó la voluntad del Causante sobre su intención de colación a los bienes dejados a sus hijos.

Evaluados los escritos, el 10 de julio de 2024, el foro primario emito *Sentencia.*[13] Mediante esta, formuló una serie de determinaciones de hechos, las cuales se transcriben a continuación:

1. El causante, Víctor Adolfo Marcial Burgos y su primera esposa, Luisa M. Vega Carrasquillo contrajeron matrimonio bajo el régimen de Sociedad Legal de Bienes Gananciales el 23 de abril de 1957.

2. Durante el matrimonio de Marcial Burgos y Vega Carrasquillo estos procrearon 6 hijos, a saber: Luisa Vanessa, Víctor Adolfo, Ivette de los Ángeles, Ivonne María Eugenia, todos de apellidos Marcial Vega.

3. El 10 de mayo de 1985, Marcial Burgos y María I. Martínez Colón contrajeron nupcias optando por un régimen de separación total de bienes, otorgando capitulaciones matrimoniales mediante la Escritura Pública Número 40 autorizada por el Notario Carmelo Ávila Medina el 7 de mayo de 1985.

4. El Dr. Marcial Burgos y la Dra. María Martínez Colón mantenían sus asuntos financieros completamente separados.

5. El Dr. Víctor Adolfo Marcial Burgos mantuvo control exclusivo de sus asuntos económicos en vida.

6. El Dr. Marcial Burgos dejó cinco cuentas bancarias, tres cuentas de inversión, tres propiedades inmuebles, más de seis cuentas por cobrar y tres deudas personales en adición a varios otros activos incluyendo acciones corporativas.

---

[11] Cabe aclarar que la oposición de sentencia sumaria presentada el 20 de marzo de 2024 por Víctor Adolfo, Juan Carlos y María Eugenia Marcial Vega no consta en el expediente del presente recurso.
[12] Véase, apéndice del recurso, págs. 2006-2014.
[13] *Íd.,* págs. 2015-2053.

7. La albacea, María Martínez Colón no tuvo acceso inmediato a los récords de todas las cuentas del causante.

8. Víctor Adolfo Marcial Burgos falleció el 7 de diciembre de 2013 a sus 90 años.

9. Al momento del fallecimiento, el Sr. Marcial Burgos padecía de demencia senil.

10. El 6 de febrero de 2014, la Albacea, a través de su abogado, envió una carta a todos los herederos convocando una primera reunión de herederos y solicitando toda información en su posesión o conocimiento sobre activos y deudas al caudal.

11. El 19 de febrero de 2014, la Albacea, a través de su abogado, le envió un correo electrónico al Lcdo. Nelson Biaggi, entonces representante legal de los Marcial Vega y la Dra. Marcial Vega, solicitando información y documentos sobre los activos y deudas del caudal.

12. Entre el 24 de febrero de 2014 y el 19 de marzo de 2014, la Albacea, a través de su abogado le solicitó a la Lcda. Rina Biaggi los expedientes del causante, los cuales ella se rehúso proveer.

13. El 14 de abril de 2014, la Albacea, a través de su abogado, le envió un correo electrónico al Lcdo. Nelson Biaggi, entonces representante legal de los Marcial Vega y la Dra. Marcial Vega, solicitando información, incluyendo las planillas informativas de Víctor Marcial y VAMB.

14. La Sra. Martinez Colón ha actuado como administradora testamentaria desde el 10 de febrero de 2014.

15. El causante Marcial Burgos dejó testamento abierto otorgado el 27 de septiembre de 2008 ante la Notario Rosario del Pilar Fernández Vera.

16. En dicho testamento instituyó como sus únicos y universales herederos a sus ocho hijos en partes iguales sobre el tercio de legítima estricta. Instituyó como heredera y albacea testamentaria a su, en aquel momento, esposa Martínez Colón y legó el remanente del tercio de libre disposición a esta una vez pagado su usufructo viudal. Además, legó el tercio de mejora en partes iguales a sus hijos Marcial Martínez.

17. María Ivelisse Martínez Colón ("Martínez Colón) fue designada albacea testamentaria con el fallecimiento de Marcial Burgos el 7 de diciembre de 2013 por un término de dos (2) años. En específico, la cláusula duodécima dispone que "[e]l albacea administrador tendrá todas las facultades que le confiere la ley a un albacea y a un administrador, además de las aquí expresadas. Ejercerá su cargo por el término de dos años, extensibles por dos años adicionales, contados a partir del momento en que terminen los litigios que se promovieren sobre la validez o nulidad del testamento o de alguna de sus disposiciones o cualquier otro litigio relacionado con la sucesión.

18. En el inciso A de la referida clausula se dispone que (s)se releva de prestación de fianza pero debe administrar los bienes corno una persona prudente y razonable. Además de las facultades de ley tendrá las siguientes:

   A. Administrar los bienes del testador y conservarlos como una persona prudente y razonable, hasta la

partición total de la herencia. Al darle facultades de administrador, desea el testador impedir que un Tribunal nombre un administrador judicial, usurpando así su voluntad.

B. Preparar y presentar al Departamento de Hacienda, dentro del plazo de ley, las planillas de caudal relicto y obtener el correspondiente relevo tras el pago, si alguno, de contribuciones. [...].

C. Pagar dentro del plazo de ley, del dinero en efectivo disponible, las contribuciones sobre herencia o personales correspondiente al caudal o testador.

D. Pagar con premura las deudas del testador con particular prioridad aquellas garantizadas con bienes inmuebles. [...].

E. Recibir y cobrar rentas, intereses, dividendos o cualquier tipo de ingreso que generen los bienes del testador y depositarlos en una cuenta de banco o nombre de la Sucesión para esos fines.

F. El albacea y administrador estará obligado a rendir cuentas, desde el momento que acepte su cargo, el último día de mes, cada cuatro meses del año, es decir tres veces al año, a todos los herederos, debidamente juramentadas ante notario, para que ninguno tenga duda sobre el buen desempeño de sus funciones.

G. Defender en mediación, arbitraje o en juicio, si fuere necesario la validez de este testamento conforme la voluntad del testador.

H. Colaborar con el contador partidor de manera diligente, rápida y certera, proveyéndole toda la información necesaria para que haga el inventario, avalúo, partición y adjudicación de los bienes.

19. Desde el 10 de febrero de 2014, la Albacea ha presentado todos sus informes de manera puntual. Cualquier informe presentado después de la fecha en que vencía el mismo, se presentó en una fecha posterior con el permiso del Tribu[n]al. Así lo declaró la Juez Iris Cancio en su Resolución del 17 de julio de 2017.

20. El Tribunal que emitió las Cartas Testamentarias concluyó que, con relación a su tercer informe, la Albacea cumplió con sus deberes.

21. Desde el 10 de febrero de 2014 hasta el presente, la Albacea ha presentado 27 informes al Tribunal.

22. Ninguno de los últimos 22 informes, presentados desde el 31 de octubre de 2016 han sido objetados.

23. Para el 31 de enero de 2017, la Albacea canceló todas las deudas del caudal.

24. La Albacea defendió la reclamación contra el caudal por las acciones de Triple-S e incrementó el caudal por $784,000.

25. Luego del 20 de abril de 2016, ninguno de los Marcial Vega ha presentado objeción a los informes presentados por la Albacea Martínez Colón.

26. Luego del 27 de agosto de 2013, la señora Martínez Colón adujo que no sabía dónde estaba su esposo, que las hijas de este de apellidos Marcial Vega le impedían verlo y hasta tuvo que contratar un investigador privado

y hacer uso de un GPS para saber dónde estaba su esposo.

27. Para el 24 de octubre de 2013, la Sra. Martínez Colón presentó una Petición sobre remedios Protectores bajo la Ley 121 contra los demandantes, caso KLC2013-001.

28. La vista comenzó el 5 de noviembre de 2013 y se reseñaló la continuación para el 9 de diciembre de 2013.

29. El 6 de noviembre de 2013, la Sra. Martínez Colón presentó una Petición sobre Declaración de Incapacidad y Nombramiento de Tutor en el caso KEX2013-0222.

30. El 6 de noviembre de 2013, los licenciados José Asencio Quiles y Rina Biaggi presentaron en representación del Sr. Víctor Marcial Burgos una demanda sobre divorcio por ruptura irreparable en contra de la Sra. María Ivelisse Martínez Colón.

31. Según la alegación número 7 de la demanda de divorcio, "[e]l demandante consigna que existe rupturas irreparables de los nexos de convivencia matrimonial, al punto que las partes viven separadas desde finales del mes de agosto de 2013. A tenor con lo antes expuesto, en el caso de autos procede se disuelva el matrimonio entre las partes, por la causal de ruptura irreparable[...]".

32. La señora Martinez Colón contrató y pagó un investigador privado para que investigara la localización de su esposo y tomara fotografías.

33. Asimismo, el testamento dispone una cláusula sobre dispensa de colacionar. La misma dispone que "[e]l testador dispensa de colacionar a todos los herederos y sustitutos mencionados en la siguiente cláusula de instituciones de herederos, con el fin de que no se les reste de lo que habrán de recibir como legitima o mejora, aquello que hayan recibido del testador, en vida de éste como donación, regalo o cualquier otro título lucrativo. Es decir, es la intención del testador que los bienes que hayan recibido sus hijos los hayan recibidos como algo adicional a lo que por legítima o mejora tienen derecho por ley y nunca en pago de la misma".

34. Ninguna parte ha impugnado la validez del testamento de Marcial Burgos.

35. El causante Marcial Burgos le prestó a su hija, Luisa Vanessa Marcial Vega la suma de $140,000.00 el 21 de julio de 2011.

36. El préstamo de $140,000.00 no consta en un instrumento negociable.

37. La demandada Luisa Vanessa Marcial Vega emitió los siguientes pagos acreditables al préstamo de $140,000.00 aludido, a saber, un pago de $20,800 ($20,000 principal más $800 de intereses), mediante el cheque número 1242 el 15 de junio de 2012; un pago de $31,500 ($30,000 de principal más $1,500 de intereses) mediante el cheque número 1325 el 15 de agosto de 2012 y un pago de $10,300 mediante el cheque número 407 del 12 de junio de 2012.

38. La demandada Luisa Vanessa Marcial computó los intereses de los pagos parciales antes indicado a un cinco por ciento. (5%).

39. El causante Marcial Burgos le prestó a su hija Luisa Vanessa Marcial Vega la suma de $10,000.00 mediante

cheque número 2133 emitido de su cuenta de Banco Popular el 17 de octubre de 1993 y $5,000.00 mediante cheque número 2168 emitido por el Banco Popular el 29 de noviembre de 1993.

40. El Dr. Marcial Burgos en el cheque número 2133 por $10,000.00 y en el cheque número 2168 por la suma de $5,000.00 escribió la palabra "Loan".

41. La albacea presentó el 6 de febrero de 2015 una reconvención en el caso DAC2014-3033 del Tribunal de Bayamón una reconvención contra la Dra. Luisa Marcial Vega mediante la cual reclamó el pago de los préstamos realizados por el causante Marcial Burgos por la cantidad de $140,000.00, $10,000.00; $5,000.00. Además, reclamó el pago de $370,000.00 por la compra a su padre de las 3,800 acciones en Colonial Realty, Inc.

42. En la contestación a dicha reconvención, la Dra. Luisa Marcial Vega aceptó que adeuda la suma prestada por su padre para un total de $15,000.00. Asimismo, reconoció que existe una deuda del préstamo que le realizó a su padre por la cantidad de $140,000.00.

43. El 15 de marzo de 1993 la demandada Luisa Vanessa Marcial Vega y su padre, Marcial Burgos firmaron un contrato de compraventa para la adquisición de 3,800 acciones de Colonial Realty, Inc, que eran propiedad de Marcial Burgos por la suma de $380,000. En dicho contrato, surge que la Sra. Luisa Vanessa Marcial Vega le entregó a su padre, Marcial Burgos $10,000.00, los cuales formaron un pronto pago para el precio pactado de $380,000.00 por dichas acciones.

44. En un documento escrito en su puño y letra del Dr. Marcial Burgos a su hija Luisa Vanessa, se resumió la transacción de la venta de sus acciones en Colonial Realty que lee: "A Vanessa $370,000- se pasó las propiedades a la corporación. Yo vendí las acciones. La venta es al 6%. Los intereses son $22,200 al año El 15 de marzo de 94 hacer el pago. Desde el 15 de marzo 93".

45. La Dra. Luisa Vanessa Marcial Vega emitió el 28 de abril de 1995 un pago de intereses anuales de $22,200.00 al Dr. Marcial Burgos.

46. La Dra. Luisa Vanessa Marcial no realizó pagos adicionales a los $10,000 y $22,200.00 por la compra de las acciones de Colonial Realty, Inc.

47. La Dra. Luisa Vanessa Marcial le debía a su padre, el Dr. Marcial Burgos la suma de $360,000.00 de principal por la compra de las 3,800 acciones de Colonial Realty, Inc., más el pago de intereses al 6%.

48. La Dra. Luisa Vanessa Marcial nunca le reclamó los certificados de acciones a su padre, el Dr. Marcial Burgos.

49. Luego de la muerte del Dr. Marcial Burgos, la Dra. Luisa Vanessa Marcial Vega se nombró presidenta de Colonial Realty.

50. El 12 de junio de 2002, Triple S, Inc., le notificó a la Dra. Luisa Vanessa Marcial Vega, en su capacidad de proveedora de servicios médicos, una determinación de sobrepago por parte de Medicare por la cantidad de $196,104.31.

51. El sobrepago notificado a la Dra. Marcial Vega fue por servicios médicos prestados por esta, citando su número de proveedora 0081590, el cual es asignado a

esta para identificarla y monitorear sus reclamaciones a Medicare.

52. El 12 de junio de 2002, Triple S, Inc. le notificó al Dr. Marcial Burgos, en su capacidad de proveedor de servicios médicos, una determinación de sobrepago por la cantidad de $219,962.21.

53. El sobrepago notificado al Dr. Marcial Burgos el 12 de junio de 2002 fue por servicios médicos prestados por éste, citando su número de proveedor, 0053031, el cual era asignado a este para identificarlo y monitorear sus reclamaciones a Medicare.

54. El 22 de julio de 2002, Triple S, Inc., le notificó a la Dra. Marcial Vega, en su capacidad de proveedora de servicios médicos, bajo su número de proveedora, 0081590, una determinación de sobrepago por la cantidad de $11,245.96.

55. El 22 de julio de 2002, Triple S, Inc., le notificó al Dr. Marcial Burgos, en su capacidad de proveedor de servicios médicos, bajo su número de proveedor, 0053031, una determinación de sobrepago por la cantidad de $15,693.11.

56. El 22 de julio de 2002, Triple S, Inc., le notificó a Marcial Radiation Oncology Center, PSC una determinación de sobrepago por la cantidad de $440,119.70.

57. El sobrepago notificado a MROC PSC el 22 de julio de 2002 fue por servicios médicos prestados por MROC PSC y estaba dirigido a MROP PSC, bajo su número de proveedor 0081496, el cual es asignado para identificarlo y monitorear sus reclamaciones a Medicare.

58. La Dra. Marcial Vega admitió ser socia/accionista de MROC.

59. El 1 de junio de 2004 la Dra. Marcial Vega emitió el cheque número 4164 do la cuenta de MROC pagadero a Medicare por la cantidad de $10,000.00 y en la nota del cheque escribió en su puño y letra: Abonar al principal

$5,000/55,000
53031/81590

60. Los números 53031 y 81590 corresponden a los números de proveedores de Dr. Marcial Burgos y la Dra. Marcial Vega.

61. La Dra. Marcial Vega y el Dr. Marcial Burgos eran dueños y proveedores de servicios médicos de Marcial Radiation Oncology.

62. La Dra. Marcial Vega recibió Planillas Informativas de MROC para los años 2005-2006 atribuyéndole el 50% de las pérdidas de MROC.

63. La suma global de los sobrepagos recibidos de Medicare como consecuencia de una sobrefactura a Medicare por concepto de servicios médicos prestados por el Dr. Marcial Burgos, la Dra. Luisa V. Marcial Vega y su corporación, MROC fue de $883,125.29.

64. La Dra. Marcial Vega admitió por conducto de su representante legal ante la Social Security Administration que su ingreso a partir del 1ero de enero de 2000 aumentó de tal manera que no se percató del aumento de ingreso como resultado de los tratamientos que fueron sobrefacturados bajo CPT código 77427.

Además, admitió que recibía pagos de Medicare por los servicios médicos prestados a través de MROC.

65. Medicare tuvo una vista administrativa sobre la deuda notificada a la Dra. Marcial Vega y al Dr. Marcial Burgos ante un Oficial de Audiencias, quien falló en contra de los peticionarios, ordenándolos a pagar el monto completo del sobre pago de $883,125.29.

66. El Dr. Marcial Burgos y la Dra. Marcial Vega presentaron una apelación y obtuvieron una vista ante el Juez Administrativo Ramón E. Quiñones el 30 de octubre de 2003.

67. En la vista ante el juez Administrativo, la Dra. Marcial Vega no negó el monto del sobrepago hecho a ella por sus servicios médico, ni el cómputo matemático por parte de Triple S, Inc. Únicamente alegó que no era responsable por el sobrepago ya que había llevado a cabo la facturación de acuerdo con la información suministrada por el Carrier.

68. El Juez Administrativo emitió una opinión el 27 de abril de 2004 declarando que tanto la Dra. Marcial Vega, el Dr. Marcial Burgos, como su corporación, MROC PSC eran responsable por el sobrepago y los ordenó a pagar el monto de $883,125.29.

69. La determinación del Juez Administrativo no fue apelada.

70. La Dra. Marcial Vega reconoció el monto de la deuda de Medicare por la sumad e $883,125.29.

71. La Corporación MROC PSC pagó a Medicare la suma de $443.125.29, quedando un balance de $440,000, que ascendía a $450,000 con intereses.

72. La Dra. Marcial Vega admitió que su padre le pagó a Medicare el balance de la deuda de $450,000 de su propio peculio. Dicho pago fue realizado el 24 de agosto de 2004 con el cheque número 354-37176 de la Cuenta de UBS Financial Services Inc., número 0425072099.

73. La Dra. Marcial Vega admitió que no pago ninguna cantidad de la deuda que le reclamó Medicare en su carácter personal ni como accionista de MROC PSC.

74. En el Certificado de incorporación de MROC, PSC figura Marcial Burgos como único incorporador, accionista de la empresa y mie[mbro] de la junta de directores.

75. El 10 de febrero de 2014, el Tribunal de Primera Instancia en el caso KJV2014-0139 expidió las correspondientes cartas testamentarias a favor de María Ivelisse Martínez Colón.[14]

En lo pertinente, determinó que la disposición de colación contenida en el testamento del Causante que leía de esta forma:

Dispensa de Colacionar: El testador dispensa de colacionar a todos los herederos y sustitutos mencionados en la siguiente cláusula de institución de herederos, con el fin de que no se les reste de lo que habrán de recibir como legítima o mejora, aquello que hayan recibido del testador en vida de éste como donación, regalo o cualquier otro título lucrativo. Es decir, es la intención del testador que los bienes que hayan recibido sus hijos los hayan recibido como algo

---

[14] *Íd.,* págs. 2021-2024

adicional a lo que por legítima o mejora tienen derecho por ley y nunca en pago de la misma.[15]

Al interpretar este lenguaje, el foro primario concluyó que "[e]l Dr. Marcial Burgos en el testamento no expresó que la dispensa de colacionar las donaciones incluyera prestamos realizados a algunos de sus hijos".[16] Destacó que el causante, cuando emitía un préstamo, no era ambiguo e identificaba el mismo con la palabra "préstamo" o "loan". Por tal motivo, el foro primario resolvió que el señor Marcial Burgos únicamente dispuso colacionar las donaciones hechas a sus hijos y no los préstamos. Por ende, el dinero otorgado en calidad de préstamo debía repagarse al caudal hereditario.

A tono con lo anterior, referente a la deuda de Medicare, el foro primario dictaminó que la Apelante no negó dicha deuda y que esta había sido notificada a la misma a su número de proveedora. A tenor con este razonamiento, el foro *a quo* condenó a la Apelante al pago de doscientos siete mil trecientos cincuenta dólares con veintisiete centavos ($207,350.27), más intereses. Por otra parte, respecto a la deuda de trecientos setenta mil dólares ($370,000.00) en concepto del impago de la compra de las acciones de Colonial Realty Inc., el foro *a quo* resaltó que esta transacción se hizo por medio de un contrato de compraventa de acciones suscrito por el Causante y la Apelante. Subrayó que, conforme lo dispone nuestro ordenamiento jurídico, no es necesario un certificado de acciones para que se materialice dicho negocio jurídico. Por consiguiente, al existir un contrato válido entre las partes, le correspondía a la señora Luisa Marcial pagar la cantidad reclamada, más un cargo de intereses por incumplimiento.

Del mismo modo, el foro primario determinó que procedía repagar al caudal hereditario las cuantías de cinco mil dólares

---

[15] *Íd.,* pág. 2047.
[16] *Íd.,* pág. 2048.

($5,000.00) y diez mil dólares (10,000.00), ya que estas fueron reconocidas por la Apelante mediante juramento. Igualmente, dictaminó que el préstamo de ciento cuarenta mil dólares ($140,000.00) concedido el 11 de julio de 2011 fue reconocido la señora Luis Marcial, pero concluyó que, al ella haber emitido unos pagos a dicha cuantía, le correspondía pagar el sobrante el cual se calculó en setenta y nueve mil setecientos dólares (79,000.00), más un interés a calculado a base del cinco por ciento (5%). Por último, el foro primario determinó que la Apelante debía pagar ciento cincuenta y cinco mil dólares ($155,000.00), más el interés legal aplicable, por concepto de una deuda solidaria por la compra de un solar en Fajardo, la cual fue costeada en su totalidad por el Causante.

Inconforme con este resultado, el 16 de agosto de 2024, la Apelante presentó *Moción de Reconsideración.*[17] Mediante esta, reiteró su postura en cuanto la aplicabilidad de la dispensa de colación. Asimismo, señaló que era necesaria una certificación de acciones para que el contrato de compraventa de acciones fuese eficaz. Tras examinar este escrito, el foro primario declaró *No Ha Lugar* la reconsideración.[18]

Inconforme aun, el 23 de septiembre de 2024, la Apelante compareció ante esta Curia mediante el recurso de epígrafe y formuló los siguientes señalamientos de error.

> Primer error: Erró el Tribunal de Primera Instancia al concluir que no existían hechos en controversia en cuanto a las partidas monetarias otorgadas por el causante a su hija y la verdadera Intención detrás de dichas transferencias.
>
> Segundo error: Erró el Tribunal de Primera Instancia al ordenar el pago por los supuestos prestamos por las partidas de $140,000.00, $5,000.00 y $10,000.00 sin antes celebrar una vista para pasar prueba sobre la intención de donar del causante.
>
> Tercer error: Erró el Tribunal de Primera Instancia al ordenar el pago por la supuesta compraventa de acciones ya que,

---

[17] *Íd.,* págs. 2060-2095.
[18] *Íd.,* págs. 2152-2153.

según dictaba la Ley de Corporaciones vigente al momento de los hechos, la entrega del certificado endosado era necesario para completar la compraventa y, al no efectuarse, es nula. En la alternativa, erró el Tribunal de Primera Instancia al ordenar el pago por la supuesta compraventa de acciones sin antes celebrar una vista para pasar prueba relacionada a la posible simulación contractual que encubrió una donación.

Cuarto error: Erró el Tribunal de Primera Instancia al concluir, por la vía sumaria, que existe una deuda de $155,000.00 por concepto de un pago hecho por el Dr. Marcial Burgos para la compra de un solar, sin haber considerado que la sociedad especial no quedó constituida. En la alternativa, erró el tribunal de primera instancia al concluir que la dra. Luisa Vanessa Marcial Vega debe al caudal $155,000.00 por concepto de 50% del pago hecho por el Dr. Marcial Burgos para la compra del solar en Fajardo, sin antes celebrar una vista para pasar prueba sobre la intención de donar el causante.

Quinto error: Erró el Tribunal de Primera Instancia al ordenar el pago de $207,350.27, monto que representa una fracción pagada por el Dr. Marcial Burgos concepto de una liquidación de deuda por sobrepago de Medicaid, sin antes celebrar una vista para pasar prueba sobre la intención de donar el causante.

Acompañó su petición de escrito, con una *Moción al Amparo de la Regla 79 del Reglamento de este Honorable Tribunal Solicitando Orden Provisional en Auxilio de Jurisdicción*. A esos fines, solicitó, en auxilio de jurisdicción, que se paralizaran los procedimientos ante el foro primario. El 25 de septiembre de 2024, esta Curia emitió *Resolución*, en la que, entre otros asuntos, declaramos No Ha Lugar la solicitud en auxilio de jurisdicción. Además, le concedimos un término de treinta (30) días a la parte Recurrida para que presentara su oposición al recurso. En cumplimiento con lo ordenado, el 18 de junio de 2024 la parte Recurrida presentó *Oposición a Apelación*.

Con el beneficio de la comparecencia de ambas partes, procedemos a exponer la normativa jurídica aplicable al caso ante nuestra consideración.

**II.**

***A. Sentencia Sumaria***

La sentencia sumaria es un mecanismo procesal cuyo propósito principal es facilitar la solución justa, rápida y económica

de los litigios que no presentan controversias genuinas de hechos materiales y, por lo tanto, no ameritan la celebración de un juicio a fondo. *Birriel Colón v. Econo y otros,* 213 DPR ___ (2023), 2023 TSPR 120, resuelto el 3 de octubre de 2023, pág. 9; Véase, además, *Segarra Rivera v. Int'l Shipping et al.,* 208 DPR 964, 979 (2022). La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R.36, permite que, en un litigio, cualquiera de las partes le solicite al tribunal que se dicte sentencia sumaria a su favor, ya sea sobre la totalidad o cualquier parte de la reclamación solicitada. Reglas 36.1 y 36.2 de Procedimiento Civil, *supra.* No obstante, para que una sentencia sumaria proceda, es necesario que de los documentos que la acompañan, se demuestre que no existe una controversia real sobre los hechos y solo reste aplicar el derecho. *SLG Szendrey v. Consejo de Titulares,* 184 DPR 133, 138 (2011) citando *Corp. Presiding Bishop CJC of LDS v. Purcell,* 117 DPR 714, 720 (1986).

Para poder demostrar eficientemente la falta de controversia sobre hechos esenciales, el promovente de la sentencia sumaria debe: (1) exponer las alegaciones de las partes; y (2) desglosar en párrafos debidamente enumerados los hechos sobre los cuáles, a su entender, no hay controversia. Regla 36.3 de Procedimiento Civil, *supra,* R. 36.3.

En *Meléndez González et al. v. M. Cuebas,* 193 DPR 100 (2015), el Tribunal Supremo estableció "el estándar específico" que debe utilizar este Foro al "revisar denegatorias o concesiones de Mociones de Sentencia Sumaria". A esos efectos, el Tribunal dispuso que:

> el Tribunal de Apelaciones debe: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están

en controversia y cuáles están incontrovertidos, y (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679 (2018).

Es decir, planteada una revisión de sentencia sumaria, el Tribunal de Apelaciones está en la misma posición que el Tribunal de Primera Instancia para resolver, por lo que debe evaluar las mociones presentadas en el foro primario y cumplir con los requisitos dispuestos en la Regla 36 de Procedimiento Civil, *supra,* al emitir su dictamen. *Meléndez González et al. v. M. Cuebas, supra.* "[L]a revisión del foro apelativo conlleva examinar *de novo* el expediente de la manera más favorable hacia la parte que se opuso a la solicitud de sentencia sumaria en el tribunal de instancia y realizando todas las inferencias permisibles a su favor". *Birriel Colón v. Econo y otros, supra,* pág. 11, citando a *Meléndez González et al. v. M. Cuebas, supra.*

En ese sentido, en el ejercicio de nuestra función revisora, estamos limitados a: (1) considerar los documentos que se presentaron ante el foro primario; (2) determinar si existe o no controversia genuina de hechos materiales y esenciales, y (3) comprobar si el derecho se aplicó correctamente. *Cruz, López v. Casa Bella y otros*, 213 DPR ___ (2024), 2024 TSPR 47, resuelto el 8 de mayo de 2024, pág. 14.

### *B. El contrato de Préstamo*

El Art. 1042 del Código Civil enumera las fuentes de las obligaciones reconocidas por nuestro ordenamiento jurídico. Así, el referido artículo dispone que "[l]as obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos o en que intervenga cualquier género de culpa o negligencia".[19] En

---

[19] Art. 1042 del Código Civil de Puerto Rico de 1930, según enmendado, 31 LPRA sec. 2992, (en adelante, "Código Civil"). El referido Código Civil de Puerto Rico de 1930, según enmendado, fue derogado por el Código Civil de Puerto Rico de 2020

particular, sobre las obligaciones de naturaleza contractual, el Art. 1206 establece que un "contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio". 31 LPRA sec. 3371. Ahora bien, para que un contrato sea fuente de obligaciones es necesario que concurran los siguientes requisitos: (1) consentimiento [válido] de los contratantes; (2) objeto cierto que sea materia del contrato, y (3) causa de la obligación que se establezca. Arts. 1213 y 1230 del Código Civil, 31 LPRA secs. 3451 y 3391; *Díaz Ayala et al. v. E.L.A.*, 153 DPR 675, 690-691 (2001). Habida cuenta de lo anterior, al concurrir los referidos elementos nace una obligación contractual válida, es decir, lo suscrito cobra vida jurídica.

Como es sabido, en nuestro ordenamiento jurídico impera el principio de la autonomía de la voluntad, en virtud del cual las partes contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarias a las leyes, a la moral, ni al orden público. Art. 1207 del Código Civil, 31 LPRA sec. 3372; *Álvarez v. Rivera*, 165 DPR 1, 17 (2005).

De la misma forma, es un principio prevaleciente en nuestro sistema de derecho que las relaciones contractuales se rigen por el principio de *pacta sunt servanda*. El referido principio, estatuido en el Art. 1044 del Código Civil, establece que "[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos". 31 LPRA sec. 2994; *PRFS v. Promoexport*, 187 DPR 42, 52 (2012). Como corolario, luego de perfeccionado el contrato, las partes quedan obligadas no solo al cumplimiento de lo expresamente pactado, sino

---

aprobado mediante la Ley Núm. 55 de 1 de junio de 2020. Para fines de la presente, se hace referencia únicamente al Código Civil derogado por ser la ley vigente y aplicable a la controversia ante nuestra consideración.

también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley. Art 1210 del Código Civil, 31 LPRA sec. 3375. De manera que, los tribunales no pueden relevar a una parte de cumplir con lo que se obligó a hacer mediante contrato cuando este es legal y válido y no contiene vicio alguno. *De Jesús González v. A.C.,* 148 DPR 255, 271 (1999).

De otro lado, en lo pertinente a la controversia que nos ocupa, el Código Civil reconoce la figura del contrato de préstamo y lo define de la siguiente manera:

> Por el contrato de préstamo, una de las partes entrega a la otra, o alguna cosa no fungible para que use de ella por cierto tiempo y se la devuelva, en cuyo caso se llama comodato, o dinero u otra cosa fungible, con condición de volver otro tanto de la misma especie y calidad, en cuyo caso conserva simplemente el nombre de préstamo.
>
> El comodato es esencialmente gratuito.
>
> El simple préstamo puede ser gratuito o con pacto de pagar interés. Artículo 1631, 31 LPRA sec. 4511

Nuestro más Alto foro ha establecido que este tipo de contrato es uno:

> [U]nilateral, por cuanto sólo produce obligaciones para una de las partes, que es el prestatario; traslativo de dominio, en el sentido de que con la entrega de la posesión se entrega también su título, ya que el prestatario recibe la cosa para gastarla, estando este obligado a devolver el género y; gratuito u oneroso, según se hayan pactado el pago de intereses o no. Toda vez que el contrato de préstamo es unilateral, por generar obligaciones a cargo del prestatario, éste estará obligado a entregar lo prestado— con sus intereses si se pactaron— una vez el término haya vencido. *Torres, Torres v. Torres et al.,* 179 DPR 481, 492 (2010).

### C. *Pagos hechos por un tercero*

El Art. 1112 del Código Civil, 31 LPRA sec. 3162, regula la figura del pago por tercero. Dicho artículo establece lo siguiente:

> Puede hacer el pago cualquier persona, tenga o no interés en el cumplimiento de la obligación, ya lo conozca y lo apruebe, o ya lo ignore el deudor.
>
> El que pagare por cuenta de otro podrá reclamar del deudor lo que hubiese pagado, a no haberlo hecho contra su expresa voluntad.
>
> **En ese caso sólo podrá repetir del deudor aquello en que le hubiera sido útil el pago.** (Énfasis suplido).

Como norma general, el pago extingue la obligación principal y con ella mueren las garantías accesorias. *Eastern Sands, Inc. v.*

*Roig Comm. Bank,* 140 DPR 703, 713 (1996). No obstante, cuando se realiza un pago por un tercero, ello puede provocar la subrogación de éste en los derechos del acreedor original, provocando que no se extingan la obligación ni sus garantías. *Id.* Asimismo, el Art. 1164 del Código Civil, 31 LPRA sec. 3248, establece que el pago por tercero conlleva la subrogación del que paga en los derechos del acreedor cuando: (1) un acreedor paga a otro acreedor preferente; (2) el que paga no tiene interés en el cumplimiento de la obligación, pero cuenta con la aprobación expresa o tácita del deudor, y (3) cuando quien paga tiene interés en el cumplimiento de la obligación. *Id.*, pág. 714.

Cuando un tercero paga con conocimiento y aprobación del deudor, sea de manera expresa o tácita, o pague porque tiene interés en el cumplimiento de la obligación, entonces el tercero tiene una acción de reembolso contra el deudor o, según su elección, podrá compeler al acreedor a que le subrogue en sus derechos. *Asoc. Cond. HIMA v. Atlantis Health Care,* 199 DPR 769, 782-783 (2018) (citas omitidas). En los casos donde el tercero paga, ignorándolo el deudor, la única acción que tendrá disponible es la acción de reembolso contra el acreedor. *Íd.*, pág. 783. De otro lado, en los casos en que el tercero paga en contra de la voluntad del deudor, no tiene disponible a su favor la acción de reembolso y solo tendrá contra el deudor una acción de repetición con relación a aquello que le haya sido útil o haya enriquecido al deudor. *Íd.* (citas omitidas).

### D. *Compraventa de Acciones corporativas*

El contrato de compraventa es un negocio jurídico bilateral el cual crea obligaciones recíprocas. *Martínez v. Colón Franco, Concepción,* 125 DPR 15, 32 (1989). Cónsono con lo anterior, el Artículo 1334 del Código Civil, 31 LPRA sec. 3741, dispone es aquel

contrato en el que una de las partes contratantes se obliga a entregar una cosa determinada y la otra parte se obliga a pagar por ella un precio cierto. Véase, *Bco. Popular v. Registrador*, 181 DPR 663, 671 (2011). Este se formaliza cuando las partes logran un acuerdo en cuanto a la cosa y al precio, "siendo estos últimos los elementos objetivos o reales de dicho contrato". *Íd.*, pág. 672. Pese a que se trata de un contrato consensual, el consentimiento no tiene requisito de forma. *Íd.*

Por otra parte, la manera de adquirir un interés propietario sobre una corporación es mediante la adquisición de acciones de capital, la cuales se clasifican como bienes muebles. C. Díaz Olivo, *Corporaciones: Tratado sobre Derecho Corporativo,* Editorial Alma Forte, 2da Ed. 2018, págs. 308-309. Así pues, es mediante un contrato de compra y venta de acciones es una transferencia de titularidad de unas acciones ya existentes de una corporación. En lo pertinente, la Ley General de Corporaciones para el Estado Libre Asociado de Puerto Rico, ley de 9 de enero de 1956, en su artículo

> 601.-Traspaso del título de propiedad de los certificados y sus acciones
> Podrá traspasarse el título de propiedad del certificado y de las acciones que éste representa, únicamente:
>
> 1. por entrega del certificado endosado en blanco, o a favor de persona determinada, por el dueño de las acciones, según conste en el certificado que las representa;
>
> 2. por entrega del certificado y de documento aparte en que conste la cesión del certificado o un poder para vender, ceder o traspasar el certificado o las acciones que representa, documento que será firmado por el dueño de las acciones, según conste en el certificado que las representa. La cesión o el poder podrán ser en blanco o a favor de persona determinada.
>
> Las disposiciones de este artículo serán aplicables, aunque la carta constitucional o las cláusulas de incorporación o el código de reglamentaciones o los estatutos de la corporación y el propio certificado estipulen que las acciones que éste representa podrán traspasarse únicamente inscribiéndose la operación en los libros de la corporación, o que deberá inscribirlas un oficial registrador o traspasarlas un agente de traspaso.

Los certificados de acciones es un documento que evidencia el derecho que representa la tenencia de una acción de capital de

una corporación. Diaz Olivo, *op. cit.* pág. 311. No obstante, el Tribunal Supremo de Puerto Rico ha aclarado que, si bien es cierto que estas certificaciones sirven como prueba, no son absolutamente determinantes para probar la titularidad de la acción. *Santiago v. Rodríguez, et al.*, 181 DPR 204, 224 (2011). De hecho, la condición de accionista puede probarse mediante evidencia extrínseca al certificado de acciones. Díaz Olivo, *op. cit.* pág. 312.

### E. La figura de la Sociedad especial en Puerto Rico

En Puerto Rico se reconoce la figura denominada sociedad civil, la cual advienen a la vida jurídica por virtud de un contrato mediante el cual dos (2) o más personas se obligan a poner en común dinero, bienes o industrias con ánimo de partir entre si las ganancias que se generen. Art. 1556 del Código Civil 31 LPRA sec. 4311. Esta entidad es distintiva por su *affectio societatis*, es decir la cooperación hacia un mismo fin promocionando la unión de intereses de diferentes individuos para fines de lucro. *Marcial v. Tomé*, 144 DPR 522, 546 (1997). Ahora bien, en la sociedad civil, los miembros responden con su patrimonio personal subsidiaria y mancomunadamente de las obligaciones de la sociedad en caso de que el patrimonio social no sea suficiente para cubrirlas *Quiñones Reyes v. Registrador*, 175 DPR 861, 874 (2009).

Como corolario de lo anterior, en nuestro sistema de derecho se incorporó la figura de la sociedad especial. Esta se diferencia de la sociedad civil respecto a que en la primera "gozan de responsabilidad limitada y, en el aspecto fiscal, no tributan como un ente separado, solamente tributan en su carácter individual. De esta forma, los socios tributarán las ganancias y las pérdidas de la sociedad especial en su planilla personal, de acuerdo con su participación distribuible en el ingreso o en la pérdida de la sociedad." *Íd.*, pág. 875. Es decir, esta se considera como una

sociedad de responsabilidad limitada, en la cual sus socios responderían limitadamente hasta el monto de su aportación. *Marcial v. Tome*, supra, pág. 545.

**III.**

En el presente recurso, la señora Luisa Marcial nos solicita que revoquemos una *Sentencia Parcial* dictada sumariamente por el foro primario el 10 de julio de 2024. Plantea, como primer señalamiento de error, que el foro *a quo* incidió al determinar que en este caso no existían hechos materiales en controversia en cuanto a las partidas monetarias otorgadas por el Causante a la Apelante y en torno a la verdadera intención detrás de dichas transferencias. En ese sentido, cuestionó en los subsiguientes cuatro (4) señalamientos de error que la concesión de distintas partidas, las cuales el foro *a quo* adjudicó en contra de la Apelante y a favor de los Apelados, eran improcedentes y debía pasarse prueba sobre cuál era la verdadera intención de dichas transferencias monetarias. En particular, en su segundo señalamiento de error, impugnó la procedencia de la partida de ciento cuarenta mil dólares ($140,000.00), proveniente de la transferencia que le hizo el señor Marcial Burgos a la Apelante y dos (2) partidas adicionales de diez mil dólares ($10,000.00) y cinco mil dólares ($5,000.00), los cuales provienen de dos cheques firmados por el Causante. Por su parte, en el tercer señalamiento de error, impugnó la deuda proveniente del contrato de compraventa de acciones y en el cuarto señalamiento de error impugnó la deuda de ciento cincuenta y cinco mil dólares ($155,000.00) por concepto de la compra de un solar mediante una sociedad especial. Finalmente, en el quinto señalamiento de error, impugnó la cuantía de doscientos siete mil trecientos cincuenta dólares con veintisiete centavos ($207,350.27) provenientes del pago que hiciera el Causante a una deuda de Medicare. Por su parte, los

Apelantes esgrimieron que ninguno de los errores imputados fue cometido por parte del foro primario. Veamos.

Dado a que se trata de la revisión de un dictamen resuelto por la vía sumaria, le corresponde a este foro revisor realizar un examen *de novo,* tanto de la solicitud de sentencia sumaria y sus anejos, así como su oposición. Efectuado el análisis correspondiente, notamos que, en esencia, los Apelados, quienes fueron los que presentaron la solicitud de sentencia sumaria, cumplieron con los requisitos que exigen la Regla 36 de Procedimiento Civil, *supra*. No obstante, la oposición de la Apelante, intitulada *Réplica a Moción Solicitando Sentencia Sumaria* no controvirtió los hechos propuestos por los Apelados, incumpliendo así los lineamientos exigidos por la Regla 36.3 (b) de Procedimiento Civil, *supra.*

Atendido lo anterior, nos corresponde determinar si existen hechos materiales en controversia y, de haberlos, exponer concretamente cuáles son. De igual forma, se esbozarán los hechos que estén incontrovertidos. Véase, *Roldán Flores v. M. Cuebas et al.*, *supra*. Tras realizar un análisis minucioso del expediente del caso, los documentos y deposiciones de la solicitud de sentencia sumaria, así como los de la oposición, **no encontramos la existencia de hechos materiales en controversia**. Cónsono con lo anterior, **adoptamos las determinaciones de hechos formuladas por el foro primario como hechos materiales incontrovertidos**. Por tanto, a la luz de los previamente esbozado, resolvemos que el primer señalamiento de error formulado por la Apelante, no se cometió, puesto que no identificamos la existencia de hechos materiales en controversia.

Resuelto lo anterior, corresponde entonces revisar *de novo* si el foro primario aplicó correctamente el derecho a la controversia que nos ocupa. De esta manera, procedemos a discutir si las partidas concedidas en el dictamen apelado procedían en derecho.

En primer lugar, es un hecho incontrovertido que el señor Marcial Burgos le prestó ciento cuarenta mil dólares ($140,000.00) a su hija, la señora Luisa Marcial el 21 de julio de 2011.[20] Asimismo, es un hecho incontrovertido que el señor Marcial Burgos le prestó a la Apelante diez mil dólares ($10,000.00) mediante cheque número 2133 emitido de su cuenta de banco el 17 de octubre de 1993 y, de la misma forma, otro cheque de cinco mil dólares ($5,000.00) identificado con el número 2186 emitido el 29 de noviembre de 1993.[21] Ambos cheques fueron identificados con la palabra "loan".[22] Surge de la prueba que la Apelante aceptó que ese dinero fue prestado y de hecho, esta ha emitido algunos pagos a la deuda de ciento cuarenta mil dólares ($140,000.00).[23] Además, como mencionáramos, la señora Luisa Marcial no contravino ninguno de estos hechos en su escrito en oposición.

Conforme a la prueba presentada por los Apelados, queda constatado que las cuantías mencionadas anteriormente, consistían un préstamo por parte del Causante a su hija la señora Luisa Marcial. Así lo confirmó la propia apelante al realizar varios pagos para sufragar la deuda de ciento cuarenta mil dólares ($140,000.00) y al Causante aceptar dichos pagos. Asimismo, el hecho de que el señor Marcial Burgos identificara los cheques con la palabra "loan" demuestra la intención que este tenía a la hora de realizar la transacción. Por tales razones, el foro primario no incidió al dictaminar que el Causante transfirió las cantidades antes mencionadas a la Apelante en calidad de préstamo. Por ende, el segundo señalamiento de error no se cometió.

---

[20] Véase determinación de hecho número 35 de la *Sentencia Parcial* apelada, apéndice del recurso, pág.2025.
[21] Véase determinación de hecho número 39 de la *Sentencia Parcial* apelada, apéndice del recurso, *Íd.*
[22] Véase determinación de hecho número 40 de la *Sentencia Parcial* apelada, apéndice del recurso, *Íd.*
[23] Véase determinación de hecho número 37 de la *Sentencia Parcial* apelada, apéndice del recurso, *Íd.*

Por otra parte, respecto a la partida correspondiente a las transferencias de acciones, consta en autos que el Causante y la Apelante suscribieron un contrato de compraventa de acciones de Colonial Realty, Inc., el cual establecía un pagaré al portador de trescientos setenta mil dólares ($370,000.00).[24] Dicho pagaré tenía como fecha de vencimiento el 5 de febrero de 2008. De la prueba surge que la mencionada cuantía nunca se satisfizo.[25] Sostiene la Apelante, que dicho contrato de compraventa no cobró eficacia ya que, según la Ley de Corporaciones de 1956, para que logre concretizarse la transferencia de acciones, era necesario que se endosara una certificación de acciones conforme lo exigía la propia ley. Sin embargo, nuestro más Alto Foro ha resuelto que las certificaciones de acciones sirven como evidencia para comprobar la titularidad de las acciones, más no son determinantes para determinar dicha titularidad. *Santiago v. Rodríguez,* supra, pág. 224. En ese sentido, el no haberse endosado un certificado de acciones no puede entenderse como un vicio que afecte la validez del contrato de compraventa suscrito por el señor Marcial Burgos y la señora Luisa Marcial. Así pues, colegimos que dicho contrato fue uno válido y vinculante, y los Apelantes tienen derecho a recobrar dicha deuda. Por consiguiente, el tercer señalamiento de error no se cometió.

Resuelto lo anterior, corresponde atender la procedencia de la partida de ciento cincuenta y cinco mil dólares ($155,000.00) provenientes de la compra de un solar por parte de una sociedad especial compuesta por la Apelante y el Causante. Sabido es que, en nuestro ordenamiento, la figura de la sociedad especial, la cual es una especie de sociedad civil, tiene como fin el poner en común dinero, bienes o industrias con ánimo de partir entre sí las

---

[24] Véase, apéndice del recurso, págs. 672-673.
[25] *Íd.*, págs. 654, 664.

ganancias que se generen. Al este ser un contrato, resulta vinculante la voluntad de las partes en dicho negocio jurídico. Conforme surge de la evidencia ante nos, el Causante y la Apelante suscribieron el 8 de mayo de 2003 mediante escritura pública la *Constitución de la Sociedad Especial.*[26] En ese sentido, el Artículo nueve (9) de dicho documento establece lo siguiente:

> Dr. Víctor Marcial Burgos por cincuenta porcientos (50%), con la suma de $22,500.00; y Dra. Luisa Vanessa Marcial Vega un cincuenta por ciento (50%) con la suma de $22,500.00. Las aportaciones futuras de los socios al capital social, también se harán en igual proporción que las aportaciones individuales antes indicadas, ya sean estas en dinero u otros bienes muebles o inmuebles, a menos que mediante escritura pública acuerden hacer aportaciones proporcionalmente distintas.[27]

Conforme surge de la prueba, el señor Marcial Burgos aportó de su dinero privativo la totalidad del dinero para la adquisición de un solar en Fajardo a través de la sociedad especial MROC, SE. Dicho solar tenía un valor de trecientos diez mil dólares ($310,000.00). Según establece el contrato, las aportaciones de los socios debían ser equitativa, por ende, la señora Luisa Marcial quedó debiendo la mitad de la cantidad que el causante aportó para la adquisición del solar. En ese sentido el razonamiento del foro primario fue correcto. Por tanto, el cuarto señalamiento de error no se cometió.

Finalmente, nos resta por examinar la partida procedente de la deuda de Medicaid. Es un hecho incontrovertido que el señor Marcial Burgos, la señora Luisa Marcial y una corporación compuesta únicamente por ambos, MROC PSC eran los responsables de un sobrepago de ochocientos ochenta y tres mil ciento veinticinco dólares con veintinueve centavos ($883,125.29).[28] De igual manera, es un hecho que no está en controversia que la

---

[26] *Íd.*, págs. 703-723.
[27] *Íd.*, pág. 712.
[28] Véase determinación de hecho número 65 de la *Sentencia Parcial* apelada, apéndice del recurso, *Íd.* pág. 2028.

corporación MROC PSC pagó cuatrocientos cuarenta y tres mil ciento veinticinco dólares con veinticinco centavos ($443,125.25) y los restantes cuatrocientos cincuenta mil dólares ($450,000.00) los pagó el Causante de su propio pecunio.[29] Es menester resaltar que, de la misma forma, es un hecho incontrovertido que la Apelante, en su capacidad de proveedora, recibió un sobrepago de ciento noventa y seis mil ciento cuatro dólares con treinta y un centavos ($196,104.31) y once mil doscientos cuarenta y cinco dólares con noventa y seis centavos ($11,245.96).[30] Por ende, el señor Marcial Burgos pagó la deuda de la señora Luisa Marcial.

Es norma trillada en nuestro ordenamiento jurídico que el que pagare por cuenta de otro podrá reclamar del deudor lo que hubiese pagado, a no haberlo hecho en contra de su expresa voluntad. 31 LPRA sec. 3162. En ese sentido, la Apelante le debe al caudal hereditario aquellas cantidades que le correspondía pagar a ella y el Causante pagó. Así pues, el foro primario no incidió en adjudicar el pago de doscientos siete mil trecientos cincuenta dólares con veintisiete centavos ($207,350.27), por consiguiente, el quinto señalamiento de error no se cometió.

**IV.**

Por los fundamentos que anteceden, confirmamos la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones

---

[29] Véase determinación de hecho número 71 y 72 de la *Sentencia Parcial* apelada, apéndice del recurso, *Íd.* pág. 2029.
[30] Véase determinación de hecho número 50 y 54 de la *Sentencia Parcial* apelada, apéndice del recurso, *Íd.* pág. 2027.